Susan MARTINO–CATT, Plaintiff,

v.

E.I. DuPONT DE NEMOURS AND COMPANY, Pioneer Hi–Bred International, Inc. Defendants.

No. 4–02–CV–90500.

United States District Court,
S.D. Iowa,
Central Division.

Feb. 20, 2003.

Michael W. Thrall, Frank B. Harty, Nyemaster, Goode, Voigts, West, Hansell & O'Brien PC, Des Moines, IA, Michael J. Carroll, Coppola, Sandre & McConville PC, West Des Moines, IA, for plaintiff.

Terri L. Combs, Faegre & Benson, Des Moines, IA, Robert L. Schnell, Jr., John B. Gordon, Deborah A. Ellingboe, Faegre & Benson, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

On September 27, 2002, Plaintiff Martino–Catt filed this action against Defendants E.I. duPont de Nemours and Company ("DuPont") and Pioneer Hi–Bred International, Inc. ("Pioneer") alleging violations of federal and state securities laws, as well as common law fraud claims, in connection with the sale by Defendants to Dr. Martino–Catt of options to purchase DuPont stock while she was an employee of Pioneer. This matter is now before the Court on Defendants' Motion to Dismiss Counts I and III for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), filed October 24, 2002. For the reasons set forth below, Defendants' Motion is **granted**.

## I. Factual Background

In March of 1999, Du Pont and Pioneer agreed to merge. (Compl.¶ 2). At the time of the merger, Pioneer had in place a Change in Control Severance Compensation Plan for Management Employees (the "CIC Plan"), which entitled CIC Plan participants to certain benefits following a "change in control" that resulted in an "Involuntary Termination of Employment." (Compl.¶ 15). These benefits included an immediate cash payment of three times the participating employee's annual compensation and twelve months of health, dental and life benefits. (Compl.¶ 15). The CIC Plan defined "Involuntary Termination of Employment" to include a "Stated Good Reason," which was defined as a "written determination by a Participant that [he or she] reasonably and in good faith cannot continue to fulfill the responsibilities for which [he or she] was employed." (Compl.¶ 15). The CIC Plan also provided that certain events, including reductions in base salary or compensation rate,

changes in job responsibilities and duties, or failure to continue any compensation, benefit, or bonus plan, would presumptively constitute "Stated Good Reason." (Compl.¶ 15). Dr. Martino–Catt was an employee of Pioneer and a participant in the CIC Plan at all times relevant to this dispute. (Compl.¶ 11, 17).

In October 1999, DuPont acquired the outstanding stock of Pioneer. (Compl.Ex. C). The parties do not dispute that this acquisition constituted a "Change in Control" under the CIC Plan. DuPont and Pioneer became concerned that the 280 CIC Plan participants were increasingly "preoccupied with obtaining a financial windfall" by claiming benefits under the CIC Plan and that this was hurting the companies' ability to retain key personnel and focus the company on integration post-merger. (Compl.Ex. D). Accordingly, DuPont and Pioneer began developing an alternative retention plan for CIC Plan participants. (Compl.Ex. D). In April, 2000, a class action lawsuit was filed in this Court before the undersigned to enforce the rights of Dr. Martino–Catt and other CIC Plan participants to CIC Plan benefits. *Bublitz v. E.I. duPont de Nemours & Co.,* 171 F.Supp.2d 906 (S.D.Iowa 2001). In the class action, this Court held that the CIC Plan did not provide an "easy trigger" for benefits and rejected the argument of the CIC Plan participants that each CIC Plan participant could " 'pull his or her own chute' at his or her sole discretion." *See id.*

In October 1999, DuPont also established a Severance Committee to review claims for CIC Plan benefits. (Compl.Ex. D). DuPont's officers[1] concluded that if all remaining CIC Plan participants left Pioneer and claimed benefits under the CIC Plan, the amount of CIC Plan benefits potentially payable would total $132 million. (Compl.¶ 3, Ex. D). The Severance Committee decided not to consider claims prior to resignation, which was challenged by Dr. Martino–Catt and other participants in the class action as an unreasonable change in the terms of the CIC Plan. (Compl.Ex. D). *See also Bublitz,* 171 F.Supp.2d 906. However, from its inception, the Severance Committee awarded benefits to 90% of those who applied; of the remaining 10%, the majority were denied because the participant was still employed by Pioneer when they applied for benefits. (Compl.Ex. C, Ex. D).

On September 29, 2000, the Board of Directors of DuPont provided Dr. Martino–Catt and other CIC Plan participants with materials (the "Prospectus") concerning the "Pioneer Hi–Bred International, Inc. Transitional Severance Compensation Plan for Management Employees" (the "Retention Plan").[2] (Compl.¶ 21). Under the terms of the Retention Plan, participants in the CIC Plan who elected to waive their rights under the CIC Plan and who agreed not to participate in the ongoing class action would receive options to purchase DuPont stock (the "Options"). (Compl.¶ 19, Ex. C). The number of options each participant received was determined by multiplying each individual's total compensation as of October 1, 1999 by three. (Compl.¶ 20). The Board of Directors of DuPont then used a method known as the Black–Scholes Option Pricing Method to value the Options.[3] (Compl.¶ 20). The Retention Plan offered severance benefits under

---

1. In support of her allegations, Dr. Martino–Catt references Exhibit D of the Complaint as "an internal memorandum [from DuPont's officers] dated June 6, 2000, to the DuPont Compensation Committee of the Board of Directors." The Court cannot identify this particular memorandum among the numerous and repetitious communications in Exhibit D summarizing the rationale and specifics of the Retention Plan. The Court therefore bases its factual discussion on Exhibit D as a whole.

2. These materials, referenced in the Complaint as the "Prospectus", included a letter from Chad Holiday, the CEO of DuPont, Jerry Chicoine, the outgoing CEO of Pioneer, W.F. Kirk, DuPont

Vice President and Rick McConnell, CEO of Pioneer encouraging Dr. Martino–Catt to accept the Options and Retention Plan; a release form; a one-page summary of the Retention Plan proposal; a six-page document containing the Option terms and conditions; the Retention Plan itself; a list of frequently asked questions ("FAQs") and answers; and a one-page document with instructions on how to accept the Options and the Retention Plan. (Compl.¶ 21).

3. The Black–Scholes Option Pricing Method is a common option-pricing method first developed in 1973 by Fischer Black and Myron Scholes.

narrower circumstances than those provided in the CIC Plan. (Compl.¶ 19).

DuPont and Pioneer created a website which allowed CIC Plan participants to ask questions and receive answers concerning the Options and the Retention Plan (the "Website"). (Compl. ¶ 22; Compl. Ex. C). A number of the misleading statements or omissions challenged in Counts I and III of the Complaint relate to responses posted by Defendants on the Website between October 2, 2000 and October 15, 2000.[4] Several questions on the Website concerned when benefits were triggered, including whether an employee could know before resigning whether he or she was entitled to CIC Plan benefits. (Compl.¶¶ 24–27). In response to the question of whether DuPont and Pioneer believed that the CIC Plan benefits "[had] already been triggered for each participant, or are triggerable at each participant's sole discretion," Defendants responded "No." (Compl.¶ 27). Defendants also stated on the Website that "the [CIC Plan] only provides benefits for individuals who leave Pioneer and whose claim for benefits is approved." (Compl.¶ 26). The Website informed CIC Plan participants that "only the Severance Committee determines whether a resignation from Pioneer was for 'Stated Good Reason' " and that "[b]ecause the Severance Committee does not issue advisory opinions regarding whether severance benefits under the [CIC Plan] might be payable in the future, an employee cannot know whether his or her claim would be approved prior to consideration by the Severance Committee." (Compl.¶ 25).

Both the Website and the Retention Plan Prospectus provided information about the valuation of the Options and the Black–Scholes Pricing Model specifically. The FAQ portion of the Prospectus defined the Black–Scholes pricing model as a "common stock option valuation method" that "is used to calculate the value of an option by considering the stock price, exercise (or strike) price and expiration date, risk free rate of return, and the standard deviation of the stock's return relative to market returns." (Compl.¶ 29, Ex. C). The FAQ document further explained that "the ultimate value of the stock option grant will depend on the appreciation of DuPont stock price over the time an individual holds the grant." (Compl.¶ 29, Ex. C). Defendants acknowledged via the Website that "option plans are inherently dependent upon conditions beyond the control of the participants. The Black–Scholes pricing model takes into account stock price, expiration date, risk-free rate of return, and stock volatility relative to the marketplace. The model does not take into account the situations where employees may terminate their employment early in the exercise period, or if they choose to exercise options early in period."[5] (Compl.¶ 33). On October 5, 2000, DuPont and Pioneer also posted on the Website a powerpoint presentation created by the consulting firm KPMG Peat Marwick which explained the nature of options generally, contained general information on the past performance of DuPont stock options and Dupont common stock, as well as two hypothetical examples of the potential value of the Options based on assumed future appreciation of DuPont common stock. (Compl.¶ 23).

Regarding the value of the Options, Defendants stated on the Website that "[we] believe the options-based proposal is potentially more valuable than the cash potential of the CIC plan, and we reaffirm that we do not believe a cash award offers long-term retention value." (Compl.¶ 30). Pioneer employees also questioned, via the Website, the benefit of the Retention Plan in light of the risk to employees of being terminated after relinquishing CIC Plan benefits and the fact that the return on the Options depended on the value of DuPont stock, noting that on

---

4. As discussed below, the facts stated in the Complaint indicate that the Website was maintained jointly by DuPont and Pioneer, who published information purporting to represent the views of Defendants as corporate entities. Responses made via the Website are therefore attributed here, as in the Complaint, to "Defendants".

5. This answer was in response to the question: "Was the fact that the exercise period on the options can be significantly reduced due to circumstances beyond the employee's control factored into the Black–Scholes pricing model?". (Compl.¶ 33).

exercise the employee would "perhaps [net] a gain, perhaps not." (Compl.¶ 34). Defendants responded that "the [Retention Plan] offers an attractive alternative that we believe is more valuable than a potential short-term gain from the [CIC Plan]. This potential gain is not guaranteed but is dependent upon a successful resolution of your claim and results in you leaving your Pioneer job." (Compl.¶ 34).

On October 13, 2000, Dr. Martino–Catt recorded notes taken at a meeting with Anthony Cavalieri, an officer of one of the Defendants,[6] where he indicated she would receive CIC Plan benefits if she were to resign and apply for them. (Compl., Ex. H). Around the same time, a Pioneer manager, Donna Zahn, informed Dr. Martino–Catt that signing onto the Retention Plan was a "litmus test" for loyalty. (Compl.Ex. H). The Complaint also points to e-mail correspondence from DuPont's Chief Operating Officer, Richard Goodmanson, stating that DuPont had brought "ongoing back pressure" to bear on those who did not accept its interpretation of the CIC Plan. (Compl.Ex. B). Relying on information provided by Defendants via the Website and in the Retention Plan packet, Dr. Martino–Catt, on October 15, 2000, signed a Retention Plan proposal in which she agreed to relinquish her rights under the CIC Plan in exchange for Options offered under the Retention Plan. (Compl.¶ 5). Dr. Martino–Catt alleges that she did so "under the duress and undue influence of Defendants." (Compl.¶ 5).

The misrepresentations and omissions challenged here can be distilled to the following:

1. Defendants failed to disclose that "[they] interpreted the CIC Plan to provide an easy trigger, which amount to a certain cash payout to each Participant" (Compl. at ¶ 5, Counts I and III).

2. Defendants misrepresented that "the Options were equivalent to, or more valuable than, the certain cash payout without explaining that the value of the Options was entirely speculative and that it depended on a number of assumptions, the specifics of which Defendants failed entirely to disclose." (Compl. at ¶ 5, Counts I and III)

3. "Defendants failed to disclose that benefits were triggered to [Dr. Martino–Catt] by virtue of changes in her job duties and compensation." (Compl. at ¶ 5, Counts I and III).

4. Statements about the value of the Options were also rendered misleading by Defendants' failure to inform Dr. Martino–Catt that "past performance is no guarantee of future performance" and that "the Black–Scholes Pricing Model, as is true with all forward-looking statements, is inherently speculative." (Compl. at ¶ 6, Counts I and III).

Count I of the Complaint alleges that these misrepresentations and omissions by Defendant were made in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b–5, promulgated under the Act, 17 C.F.R. § 240.10b–5, as part of a scheme to "systematically undervalu[e] the CIC Plan benefits" and "systematically overvalue the Options," thereby inducing Dr. Martino–Catt and other CIC Plan participants to waive their rights under the CIC Plan as cheaply as possible. (Compl. at ¶ 5, Counts I and III). Dr. Martino–Catt alleges that Defendants had "actual knowledge of the misrepresentations and omissions of material facts" alleged in the Complaint "or acted in reckless disregard for the truth." (Compl. at ¶ 7, Counts I and III). Count III of the Complaint asserts parallel claims under § 502.401 of the Iowa Uniform Securities Act. Dr. Martino–Catt claims generally that as a result of Defendants' wrongful conduct, "[she] suffered damages in connection with her waiver of her rights under the CIC Plan for the grant of Options." (Compl. at ¶ 10, Counts I and III).

## II. Standard for Motion to Dismiss

In addressing a motion to dismiss under Rule 12(b)(6), this Court "is constrained by a stringent standard .... A complaint should

---

**6.** Anthony Cavalieri is referred to as "an officer of Defendant" in Paragraph 42 of the Complaint, citing to the notes in Exhibit G.

not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 545–46 (8th Cir.1997). In addition, the complaint must be liberally construed in the light most favorable to the plaintiff. *See Parnes,* 122 F.3d at 546. Finally, when considering a motion to dismiss for failure to state a claim, a court must accept the facts alleged in the complaint as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 741 (8th Cir.2002). This deferential standard of review is, however, modified by the heightened pleadings rules of the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (the "PSLRA") and the requirement of Federal Rule of Civil Procedure 9(b) that fraud be pleaded with particularity. The Court will first review Count I under the pleading standards of the PSLRA and then turn to the state securities fraud claims in Count III. `

### III. Count I: Section 10(b) and Rule 10b–5 of the Securities Exchange Act

#### A. Securities Fraud Pleading Standard

■ "Rule 10b–5, promulgated by the Securities and Exchange Commission under Section 10(b) of [the Act] prohibits fraudulent conduct in the sale and purchase of securities." *In re Navarre Corp.,* 299 F.3d at 741 (citing 15 U.S.C. §§ 78j, 17 C.F.R. § 240.10b–5). To state a claim under Rule 10b–5, a plaintiff must plead "1) misrepresentations or omissions of material fact or acts that operated as fraud or deceit; 2) causation, often analyzed in terms of materiality and reliance; 3) damages; and 4) fraudulent activity occurring in connection with the purchase or sale of securities." *Id.* (citing *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1533–34 (8th Cir.1996)). *See also Rizzo v. The MacManus Group,* 158 F.Supp.2d 297 (S.D.N.Y.2001). Although not explicitly mentioned in the text of the rule, scienter is also an essential element of a Rule 10b–5 claim. *Florida State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 660–61, 653

(8th Cir.2001). On this Motion, Defendants challenge the complaint with regard to each of these elements. Specifically, Defendants state that the Complaint is deficient with regard to: 1) particularity as to the identity of the defendant; 2) materiality of certain alleged representations and omissions; 3) particularity of the allegations of scienter; and 4) the element of damages.

Federal Rule of Civil Procedure 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The particularity requirement [of Rule 9(b) ] entails the pleading of "the who, what, when, where and how: the first paragraph of any newspaper story." *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 549 (8th Cir.1997). However, for claims brought under Rule 10b–5 and Section 10(b), the PSLRA "supersedes reliance on FRCP 9(b) . . . and embodies [its] standards." *In re Navarre Corp.,* 299 F.3d at 742.

■ To satisfy the requirements of the PSLRA, the complaint must first specify each misleading false statement or misleading omission and explain why it is misleading. 15 U.S.C. § 78u–4(b)(1) (Supp. IV 1998). Claimants do not need to "plead *all* facts", as long as the facts pleaded "provide adequate basis for believing the statements were false." *Green Tree,* 270 F.3d at 667. The Complaint must also state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2); *Green Tree,* 270 F.3d at 660–61, 667. Knowledge or recklessness, but not negligence, is sufficient to satisfy the 10b–5 scienter requirement. *Alpern,* 84 F.3d at 1534; *Green Tree,* 270 F.3d at 653–54. Applying these standards to the misleading statements and omissions alleged in the Complaint, the Court finds that Count I fails to adequately plead fraud.

#### B. Particularity as to Identity of the Defendant

Defendants first challenge the sufficiency of the Complaint for its failure to allege specifically *who* made the alleged misrepresentations or failures to disclose. The allegations in Counts I and III, with the possible

exception of the "easy trigger" allegation, are attributed to "Defendants" jointly, without reference to particular officers or directors of Defendants who made, or should have made, the challenged communications. Dr. Martino–Catt argues that this type of broad identification is sufficient under the "group pleading doctrine."

1. *Website and Retention Proposal Statements*

■ The Court agrees that reference to "Defendants" jointly is sufficiently "particular" with regard to communications on the Website and in the Retention Plan Prospectus. Under the group pleading doctrine, "the identification of individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group published documents." *In re Aetna, Inc. Sec. Litig.*, 34 F.Supp.2d 935, 949 (E.D.Pa.1999). Courts confronting the question have held that the PSLRA has not abolished the group pleading doctrine. *See In re Raytheon Securities Litigation*, 157 F.Supp.2d 131, 152 (D.Mass.2001) (reviewing caselaw from other circuits). The Website and the Retention Plan Prospectus materials are "group published documents," purporting to express the views of Defendants as corporate entities.

In addition, the Complaint shows that the Website and the Retention Plan packet were the joint product and communication of Defendants. (Compl. Ex. C and D). Thus, it is enough for Dr. Martino–Catt to allege that Defendants jointly made these communications. Although the general, and joint, identification of Defendants makes appropriate pleading of scienter difficult,[7] it is sufficient to put Defendants "on notice" with respect to "who" made statements that appear on the Website or in the Retention Plan Prospectus.

2. *Omissions; "Easy Trigger" Interpretation*

■ The only other allegations in Counts I and III concern omissions. Setting aside the

question of whether a duty to disclose applies, the Court believes that the identification of "Defendants" as together failing to disclose is sufficiently pleaded here. Dr. Martino–Catt has sufficiently pleaded facts showing the joint nature of Defendants' decision-making and communications regarding the CIC Plan. While the Complaint does not clarify the roles of each Defendant or its officers in speaking for Pioneer or DuPont during the period of the merger and the Retention Plan offer, the PSLRA does "not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge, LLC v. RealTech Sys. Corp.*, 173 F.Supp.2d 129, 137 (S.D.N.Y. 2001). On these facts, it is enough that Dr. Martino–Catt alleges that Defendants had a duty to disclose on behalf of Defendants with regard to the CIC Plan.

■ This is not the case, however, for the alleged failure of "Defendants" to disclose that "they" had secretly interpreted the CIC Plan to provide an "easy trigger" for benefits, "amounting to a certain cash payout." (Compl. at ¶5, Counts I and III). As evidence that Defendants held this view, Dr. Martino–Catt, in her brief on this Motion, points to a letter from "DuPont's officers" of June 6, 2000, where she says the officers "explained ... that the easy trigger contained in the CIC Plan all but guaranteed that ninety percent of the CIC Plan participants would leave DuPont and collect benefits." (Compl. at ¶16; Ex. D).

Even if the Court could conclude from the materials in Exhibit D that "DuPont's officers" held the view Dr. Martino–Catt urges, it is not clear from the Complaint *which* officers authored the communications cited to as Exhibit D. Since the letters and other documents in Exhibit D are not company-authored public documents like the Website or an annual report, the group pleading doctrine does not apply. As noted more fully

---

7. The Court notes that the group pleading doctrine is generally argued to show scienter in cases charging corporate officers and directors individually for securities fraud on the basis of the contents of documents published in the company's name. It acts only as a rebuttable presumption that corporate officers and directors have knowledge of the company's affairs. *In re Aetna, Inc.*, 34 F.Supp.2d 935; *In re BankAmerica Corp. Securities Litigation*, 78 F.Supp.2d 976, 987 (E.D.Mo.1999).

below, none of the documents in Exhibit D actually contain the statements and explanation referenced in Paragraph 16 of the Complaint, making a more precise allegation of the source of these "interpretations" necessary. A more specific allegation of identity is also required here because, as Defendants point out, the interpretation of the CIC Plan was much debated in the prior litigation before this Court, and Defendants' officers did not share the same views on the matter.[8] Consequently, the Court finds that the Complaint fails to plead with the required specificity the identity of the person(s) who "interpreted" the CIC Plan to provide an "easy trigger" or "certain cash payout." Allegations that "defendants made a particular statement at a given time, without providing further particulars about who made the statement and when" are insufficient under the PSLRA. *In re Navarre Corp.*, 299 F.3d at 743.

### C. Allegations of Fraudulent Misrepresentation and Omission

In order to sustain a motion to dismiss, Dr. Martino–Catt must state with particularity facts, which, if true, indicate why allegedly false or misleading statement was false or misleading at the time they were made. *In re Navarre Corp.*, 299 F.3d at 743.

Material omissions are also actionable under Rule 10b–5. It is clear that when a defendant operates under an affirmative duty of disclosure, "silence in connection with the purchase or sale of securities may operate as fraud actionable under 10(b)" of the Exchange Act. *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). "Even absent a duty to speak, a party who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." *Kushner v. Beverly Enterprises*, 317 F.3d 820, 831 (8th Cir.2003) (quoting *Helwig v. Vencor, Inc.* 251 F.3d 540 at

561 (6th Cir.2001) (*en banc*)). The Complaint is clear that Defendants chose to provide information to Dr. Martino–Catt regarding the CIC Plan and the Retention Proposal and thus assumed a duty to do so fully and truthfully. The Court need not address here whether the Complaint has alleged facts showing an independent duty of disclosure otherwise attached.[9] Of course, it is axiomatic that a failure to disclose is only fraudulent if the information allegedly withheld is true.

Even granting Dr. Martino–Catt the benefit of every reasonable inference, as the Court must do on a motion to dismiss, the Court cannot find that she has pleaded fraud as to Counts I and III with sufficient particularity under either the Rule 9(b) or the more rigorous standard of the PSLRA. Each of the misstatements and omissions alleged in Counts I and III is discussed in turn below.

### 1. *Failure to Disclose an "Easy Trigger" Interpretation*

■ Count I first alleges that Defendants failed to disclose that certain DuPont officers, and Defendants generally, "interpreted the CIC Plan to provide an easy trigger, which amounted to a certain cash payout to each Participant." (Compl. at ¶ 5, Counts I and III). Setting aside for the moment the difficulty of showing "corporate scienter" as to this allegation, the facts of the Complaint do not support the inference that this alleged omission is true.

Dr. Martino–Catt argues on this Motion that the facts supporting this allegation are found in Paragraph 16 of the Complaint, which states that a June 6, 2000 letter from "DuPont's officers" "explained ... that the easy trigger contained in the CIC Plan all but guaranteed that ninety percent of the CIC Plan participants would leave DuPont and collect benefits." (Compl.¶ 16, Ex. D). The connection between Paragraph 16 and

---

**8.** The Court takes judicial notice of this fact based on the proceedings in *Bublitz,* 171 F.Supp.2d 906. Fed.R.Evid. 201(f).

**9.** There is an affirmative duty of disclosure if: 1) one party stands in a fiduciary relationship to another; ii) one party possesses superior knowledge not available to the other and knows that

the other is acting on the basis of mistaken knowledge; and iii) where a party has made an inaccurate, incomplete or misleading prior disclosure. *Rizzo v. MacManus Group,* 158 F.Supp.2d 297, 302 (S.D.N.Y.2001) (citations omitted).

the "easy trigger" allegation of Count I is not clear to the Court from the face of the Complaint. More importantly, the Court cannot identify in the cited letter, or elsewhere in Exhibit D, anywhere where such an "explanation" was given.[10] Dr. Martino–Catt appears to have read the following statement in the letter to the DuPont Compensation Committee to show that "Defendants" believed the Plan provided an "easy trigger": "In the event of ... termination for 'stated good reason' during [the benefit period], [CIC Plan benefits are] payable.... [The CIC Plan] therefore applies as a result of DuPont's acquisition of Pioneer. 'Stated Good Reason' exists if a participant believes he cannot in good faith continue to perform the responsibilities for which he was hired." (Compl. ¶ 16; Ex. D—draft letter). In referencing this document and others in Exhibit D, Dr. Martino–Catt pleads facts showing that certain officers affiliated with Defendants believed 1) the CIC Plan had a broad definition of "Stated Good Reason" and 2) that the merger constituted a "Change in Control" under the terms of the CIC Plan. *See also* Compl. ¶ 3. The facts of the Complaint also supports the inference that *most* applicants received benefits and that this motivated, in part, Defendants to adopt and promote the Retention Plan to Dr. Martino–Catt.

However, the Complaint and the communications it references do not show that Defendants believed the CIC Plan provided an "easy trigger" or a "certain cash payout to each participant" as Count I alleges. The communications attached as Exhibit D to the Complaint rather show that Defendants were concerned that CIC Plan *participants* believed the CIC Plan was an opportunity for a "windfall," not that Defendants necessarily agreed with that view. (Compl., Ex. D). In fact, the terms of the CIC Plan provided to Dr. Martino–Catt state that an award of benefits was made only after the Severance Committee determined the resignation was for "Stated Good Cause, that an employee must first resign to claim benefits, and that the Severance Committee would not issue advisory opinions regarding CIC Plan benefits. Defendants also disclosed to CIC Plan participants that the Severance Committee had awarded CIC Plan benefits to 90 percent, not 100 percent, of those who applied. The Court finds that the Complaint does not plead facts showing that 'Defendants' believed CIC Plan benefits were an 'easy trigger' or 'certain cash payout.' " [11]

Dr. Martino–Catt also argues on this motion that Defendants made an affirmative statement that was rendered false or misleading by the failure to disclose Defendants' "easy trigger" interpretation. On October 12, 2000, Defendants responded "No" on the Website when asked whether "DuPont and Pioneer believe that the CIC Plan benefits have already been triggered for each Plan participant, or are triggerable at each participant's sole discretion, as claimed in the class action lawsuit." For the reasons stated above, the Court cannot find the facts alleged support the inference that this statement was false or misleading.

2. *Assertions that Options Were "Roughly Equivalent" in Value or More Valuable Than CIC Plan Benefits*

▮ Dr. Martino–Catt next alleges that Defendants asserted the "Options were roughly equivalent to, or more valuable than, the certain cash payout, without explaining that the value of the Options was entirely speculative and that it depended on a number of assumptions, the specifics of which Defendants failed entirely to disclose." (Compl. at ¶ 5, Counts I and III). This

---

10. Exhibit D contains a draft letter to the Compensation Committee that is not dated, which the Court references in this discussion. The Court is unable to identify with certainty the letter referenced in Paragraph 16 of the Complaint.

11. Defendants argue that this Court in a class-action lawsuit concerning the CIC Plan found that the CIC Plan did not in fact provide participants an "easy trigger" for benefits, and that therefore, Defendants' could not have been required to disclose that they *viewed* the CIC Plan to provide such an "easy trigger." *See Bublitz*, 171 F.Supp.2d 906. The Court's conclusion in *Bublitz* is not dispositive here—the issue is not what this Court found to be the case concerning the CIC Plan but what Defendants *believed* concerning the CIC Plan, as compared to what they communicated, or failed to communicate to Dr. Martino–Catt about it.

allegation fails to plead fraud on a number of grounds. First, the Complaint does not identify with particularity *who* made this statement, any adverse knowledge they had, or the basis for this knowledge. From her brief on this Motion, it appears that this is because, as with the first allegation, Dr. Martino–Catt has paraphrased statements made by Defendants on the Website and in the Retention Proposal, which are not attributed to any particular individual officer of either Defendant. (Plaintiff's Brief at 15). Assuming this is the case and that the Website statements are therefore properly attributed to Defendants, the Complaint does not allege facts showing Defendants' actual statements, as quoted in the Complaint, were materially false or misleading, or that the omitted explanation (that the Options' value was speculative) was true.

### a. *Option Valuation*

The valuation of the Options was estimated on the basis of three times the employee's salary so that the employee would receive a number of Options "equivalent" to the amount of the cash payment under the CIC Plan. (Compl.¶ 32). Dr. Martino–Catt does not dispute this formula. Thus, the Complaint provides no facts showing that the value of the Options was not in fact "roughly equivalent" to the value of the CIC Plan benefits.

Both the Website and the Retention Plan materials discussed the factors the Black Scholes Pricing Model considers in valuing options. (Compl.¶ 33, Ex. C). Dr. Martino–Catt does not indicate how the lack of more detailed information on any underlying assumptions of the model was fraudulent, or allege how the information available to her on the valuation method was misleading absent these "specifics."

More critically, she alleges no facts showing a different "actual" value of her Options at any point in time or any statement of the losses she suffered by waiving her CIC Plan benefits in exchange for the Options. If she had, for example, alleged an approximate value for the Options that was negligible compared to three times her annual salary (the value of the CIC Plan benefits), her

allegations of intentional "overvaluing" of the Options might have more force. As it stands, Dr. Martino–Catt fails to plead anywhere in the Complaint how many options she was awarded, the value of her CIC Plan benefits, or even her annual salary during the period in question. Thus, the Complaint has not pled facts showing that Defendants' statements of the Options' value were in any way misleading.

### b. *Value of the Options Relative to CIC Plan Benefits*

In discussing the relative value of the Options and the CIC Plan benefits, Defendants stated: "We believe the options-based program is *potentially more valuable* than the cash potential of the CIC Plan." (Compl.¶ 30). The Website also stated that, "[t]he retention plan offers an attractive alternative that we believe is *more valuable* than a *potential* short-term gain [under the CIC Plan]," and that the "potential" gain from the CIC Plan benefits "is not guaranteed but depends on a successful resolution of your claim and results in you leaving your Pioneer job." (Compl.¶ 34). This last statement arguably made the value of the Options appear greater, and more certain, than the CIC Plan benefits. In fact, neither alternative offered a 100 percent guarantee, and the cash grant was only "potential" because of the discretion of the Severance Committee, whereas a holder of Options assumed market risk.

However, the context of these statements, as alleged in the Complaint, shows that the risk inherent in the Options was disclosed to Dr. Martino–Catt. In the same Website response where Defendants term the Options "more valuable" than the CIC Plan benefits, they also cautioned that, "the ultimate value of the [Options] depends on the appreciation of DuPont stock price over the time the individual holds the grant." (Compl.¶ 34). This belies the allegation that "DuPont and Pioneer took steps that made the value of the Options appear as if it was certain." (Compl.¶ 6). Dr. Martino–Catt also pleads in her Complaint numerous other disclosures by Defendants that the Options' value was uncertain. For example, the Prospectus she

received stated that the "ultimate value of the stock option grant will depend on the appreciation of DuPont stock price over the time an individual holds the grant." (Compl.¶ 29).

The allegations of the Complaint make clear that Defendants viewed the Retention Plan as a retention plan—they believed it would better motivate employees to stay with Pioneer. (e.g. Compl.¶ 34). Taken together, Defendants' statements at most suggest that Defendants wanted to encourage CIC Plan participants to view the Retention Plan favorably by highlighting its benefits and downplaying its uncertainties; similarly, Defendants minimized the attractive aspects of the CIC Plan in its communications. However, since the Complaint does not plead facts showing Defendants' belief to be other than what it stated on its Website, the optimistic statements concerning the Options cannot support an allegation of fraud. *See Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir.2001) ("Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness.").

Even if the Court accepts Dr. Martino–Catt's argument that Defendants' emphasis on the relative benefits of the Options and the weaknesses of the CIC Plan benefits are enough to infer *how* Defendants communications were misleading, these facts cannot pass the materiality test for actionable fraud. "Because materiality is often a fact intensive inquiry, summary adjudication of a Rule 10b–5 claim is not appropriate on the ground that the alleged misstatements or omissions were not material 'unless they would have been so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Rizzo v. MacManus Group*, 158 F.Supp.2d 297 (S.D.N.Y.2001). While the Complaint alleges facts showing that Dr. Martino–Catt may *actually* have been misled by the positive spin Defendants put on the Retention Plan, the test is not based on a plaintiff's subjective experience. Considering the totality of the information made available to Dr. Martino–Catt, the Complaint does not plead facts sufficient to demonstrate that any statements or omissions by Defendants regarding valua-

tion were materially false or misleading. *See Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 203 (5th Cir.1988) (predictions may be actionable if it is misleading because it "fails to state a material fact or states a material fact falsely").

### c. Failure to Disclose Valuation is "Speculative"

The Complaint also fails to plead facts showing that the value of the Options, as estimated by the Black–Scholes Pricing Model, was "entirely speculative." Again, the Complaint recognizes that the Black–Scholes model is an established one and that it determines a valuation based on a number of market factors. Dr. Martino–Catt appears to argue that the facts pled concerning the uncertainty in options valuations are sufficient to support her claim that it was "entirely speculative." (Plaintiff's Brief at 17). The Court does not believe the facts sustain an extension of this kind. To allege fraud for nondisclosure here, Dr. Martino–Catt must first plead facts showing the valuation was not only an estimation or prediction, but that it was indeed "entirely speculative."

### 3. Failure to Disclose Triggering of Plaintiff's CIC Plan Benefits

 Dr. Martino–Catt next alleges that Defendants failed to disclose that benefits were triggered to [her] by virtue of changes in her job duties and compensation. (Compl. at ¶ 5, Counts I and III). Defendants argue that her benefits were *not* "triggered" because she had not yet resigned and applied for them, so there was no reason for them to make this disclosure. Dr. Martino–Catt appears to mean by "triggered" simply that she had grounds to claim benefits by application to the Severance Committee when she experienced job changes following the merger, but Defendants failed to inform her. Adopting this broader reading as consistent with the facts alleged, the Court nonetheless finds Defendants' failure to make this disclosure is not materially fraudulent or misleading.

Dr. Martino–Catt pleads that Defendants knew that the merger was a "Change in Control," that "the CIC Plan benefits were triggered" as a result of the merger, and that

"everyone knew of the potential exposure." (Compl. ¶ 3; Ex. A). The Complaint also alleges that "certain high-ranking officials at Pioneer" had determined that CIC Plan benefits were triggered for all CIC Participants, including Dr. Martino–Catt, as a result of changes in her job duties and compensation. (Compl. ¶ 5, Counts I and III). These facts are sufficient to plead knowledge of Defendants, contemporaneous with the alleged failure to disclose, that events surrounding the merger made employees eligible for CIC Plan benefits, again, presumably, after going through the necessary procedures. Defendants also had a duty of candor to the CIC Plan participants when communicating about the Retention Plan. *See Kushner*, 317 F.3d at 831. The Complaint does allege that Defendants failed to disclose this knowledge, ie. that the merger constituted a "Change in Control," which triggered CIC Plan benefits, and that the job changes Dr. Martino–Catt experienced as a result made her eligible for these benefits. Thus, the Complaint sets forth facts showing a failure to disclose and demonstrating how such an omission was misleading.

However, the Court does not find that these facts are sufficient to show that this failure to disclose was material in light of the "total mix" of information available to Dr. Martino–Catt. A "fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir.2002). Defendants did disclose that 90 percent of applicants were granted CIC Plan benefits by the Severance Committee. Dr. Martino–Catt also was aware that she experienced a reporting structure change after the merger, as the list tracking post-merger job changes shows. (Compl.Ex. E). Finally, Dr. Martino–Catt has attached to her Complaint notes from a meeting with Anthony Cavalieri, an officer of one of the Defendants, where he indicated she would receive CIC Plan benefits if she were to resign and apply for them. (Compl., Ex. H).

Defendants informed CIC Plan participants that employees must first resign and apply before their claim would be considered, and that the Severance Committee would not issue "advisory opinions." (Compl.¶ 25). Dr. Martino–Catt's allegation here is essentially that Defendants did not provide her with such an "advisory opinion"—that the change in reporting structure triggered her right to claim benefits. However, the facts show that a reasonable investor in Dr. Martino–Catt's position would have had enough information to know she could apply to the Severance Committee for benefits and that her application would likely be accepted. The Court cannot conclude that a reasonable investor would view a further direct disclosure by Defendants that Dr. Martino–Catt's benefits had been triggered as contributing to the "total mix" of information available to her. Accordingly, the Complaint has not alleged facts showing an omission of material fact.

### 4. *Failure to Make Cautionary Disclosures*

Finally, Dr. Martino–Catt alleges that Defendants' statements about the value of the Options were also rendered misleading by Defendants' failure to inform her that "past performance of the DuPont Options and DuPont common stock is in no way indicative of future performance and is not a guarantee of future results" and that "the Black–Scholes Pricing Model, as is true with all forward-looking statements, is inherently speculative." (Compl. at ¶ 6, Counts I and III). Although Defendants were under a duty to communicate fully and truthfully with respect to the Retention Plan, these allegations also fail to support a claim for fraud by omission of material fact.

The Court has already reviewed above the facts presented in the Complaint regarding the Black Scholes model and concluded that Defendants' alleged failure to label the Black Scholes Model "speculative" does not plead fraud. The Court has also already discussed the numerous statements by Defendants on the Website and in the Retention Plan packet explaining that the Black Scholes model valuations may differ from the actual future value of the Options. Taking the facts alleged as a

whole, the Court cannot conclude that it is substantially likely a reasonable investor would find that either of these statements would have added anything to the information available to Dr. Martino–Catt if they had been made to her. *See Alpern v. UtiliCorp,* 84 F.3d 1525 (8th Cir.1996). Moreover, it appears that the KPMG presentation posted on the Website contained the precise disclosure claimed here to have been omitted: that "past performance is no guarantee of future performance." (Defendants' Brief, Ex. A).[12] Although the Court must give the nonmoving plaintiff the benefit of all reasonable inferences on a 12(b)(6) motion to dismiss, allegations of fraud cannot rest on the thin reed of a mere failure to include whatever disclaimers a plaintiff can imagine, particularly when substantive information to the same effect has already been provided to her.

### D. Scienter

■ Scienter, that is, a showing of recklessness or actual intent to defraud, is an essential element of a 10b–5 claim. *Green Tree,* 270 F.3d at 653. Under Rule 9(b), "malice, intent, knowledge, and other condition of mind ... may be averred generally." Fed. R. Civ. Proc. 9(b). The general allegations of scienter contained in the Complaint are therefore sufficient under Rule 9(b). However, under the PSLRA, "[i]nferences of scienter survive a motion to dismiss only if they are both reasonable and strong... [meaning] that plaintiffs are entitled only to the most plausible of competing inferences." *Green Tree,* 270 F.3d at 660–61, 667; *In re Navarre Corp.,* 299 F.3d 735. The Complaint fails to sufficiently plead scienter of Defendants under this standard.

The first difficulty Dr. Martino–Catt faces in pleading scienter is that Defendants here are corporate entities, not individuals, and many of the affirmative statements she challenges appeared in "group-published documents" on the Website and the Retention Plan packet. To show adverse knowledge on the part of Defendants, as with any allegations of "corporate scienter," "depend[s] heavily on the awareness of the directors and officers" whose knowledge can be imputed to the company. *Nordstrom v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435. (9th Cir.1995). Dr. Martino–Catt does not plead any facts sufficient to infer that individual directors and officers had knowledge adverse to the information disclosed to her or otherwise acted with recklessness or an intent to defraud.

Scienter may be shown by setting forth facts demonstrating either: 1) "a mental state embracing an intent to deceive, manipulate or defraud; 2) " 'highly unreasonable omissions or misrepresentations' involving 'an extreme departure from the standards of ordinary care, and ... presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it' "; or 3) "unusual or heightened motive" and an opportunity to effectuate that motive. *In re K–tel,* 300 F.3d at 893–94.

The Court first considers whether the Complaint alleges sufficient facts to find scienter under the "motive and opportunity" method. To show unusual or heightened motive, the "plaintiffs must assert concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* at 894 (citing *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001)). The Complaint here alleges no facts that any individual director or officer of either Defendant had a motive and opportunity to defraud. Allegations of a desire to avoid significant potential liabilities, effectu-

12. On a 12(b)(6) motion to dismiss, the court may consider, in addition to the pleadings, materials "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner,* 317 F.3d at 831 (citations omitted). The Complaint states that "DuPont and Pioneer posted on the Website a powerpoint presentation created by the consulting firm KPMG Peat Marwick which explained the nature of options generally, contained general information on the past performance of DuPont stock options and Dupont common stock, as well as two hypothetical examples of the potential value of the Options based on assumed future appreciation of DuPont common stock." (Compl.¶ 23). The contents of the KPMG presentation are adequately referenced and described in the Complaint and are thus appropriately considered by the Court on this motion. However, the Court's conclusion that the challenged omissions were immaterial does not rely on the KPMG presentation disclaimer.

ate the merger, or retain critical employees do not satisfy the scienter requirements. "Unsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law." *Id.; Green Tree,* 270 F.3d at 664 (finding a desire "universally held among corporations and their executives ... does not contribute significantly to an inference of scienter").

Although the "motive and opportunity" test is not the only method for determining scienter, absent a showing of motive and opportunity to defraud, "other allegations tending to show scienter must be particularly strong in order to meet the [PSLRA] standard." *Green Tree,* 270 F.3d at 660. Where a plaintiff has failed to plead facts showing that the defendants' statements were materially inaccurate, such a strong showing will obviously be difficult. The facts of the Complaint do suggest that Defendants pressured Dr. Martino–Catt to accept the Retention Plan and that Defendants' communications with CIC Plan participants placed the Retention Plan in an attractive light relative to the CIC Plan. Nonetheless, these facts do not give rise to a strong inference that Defendants engaged in either reckless or intentional wrongdoing. Dr. Martino–Catt alleges generally that Defendants had "actual knowledge of the misrepresentations and omissions of material facts or acted in reckless disregard for the truth." However, the facts pleaded do not support this conclusion. The Complaint fails to plead scienter under the heightened pleading standards of the PSLRA.

### E. Conclusion

As the length of this discussion shows, the Complaint is not deficient for failure to plead facts about Defendants' communications regarding the CIC Plan and the Retention Plan. Rather, the Complaint cannot survive under either the Rule 9(b) or PSLRA standards because the facts pleaded do not provide an adequate basis for believing that

Defendants' statements were false or materially misleading. *See Green Tree,* 270 F.3d at 667. More critically, the Complaint also fails to support a strong inference that Defendants acted with recklessness or an intent to defraud. Despite the length of the Complaint and the volume of supplementary materials attached, the facts alleged are insufficient to state a claim for fraud under the standards of Rule 9(b) and the PSLRA.

### IV. Count III: Pleading Standards for Securities Fraud Under Iowa Law

Iowa courts coordinate the interpretation and administration of Iowa's securities laws with related federal regulations. *Goettsch v. Diacide Dist.,* 561 N.W.2d 369, 373 (Iowa 1997) (quoting language from Iowa Code § 502.611 to that effect). *See also State v. Diacide Distribs., Inc.,* 561 N.W.2d 369, 375 (Iowa 1997) ("Iowa's prohibition of fraudulent practices [under Iowa blue sky laws], as well as its enforcement provisions, closely track the prohibitions and enforcement of rule 10b–5 at the federal level."). Defendant appears to argue on this basis that the heightened pleading standards of the PSLRA necessarily apply to securities fraud claims under Iowa law. The Court expresses doubt as to whether such a conclusion should be drawn.

An unintended consequence of the enactment of the PSLRA, was to "drive many would-be plaintiffs to file their claims in state court, based on state law, in order to circumvent the strong requirements established by the statute." *Dudek v. Prudential Securities Inc.,* 295 F.3d 875, 877 (8th Cir.2002) (quoting *In re Lutheran Bhd. Variable Ins. Prod. Co. Sales Practices Litig.,* 105 F.Supp.2d 1037, 1039 (D.Minn.2000)). In response, Congress enacted the Securities Litigation Uniform Standards Act of 1998 (SLUSA), which amended the Securities Act of 1933 and the Securities Exchange Act of 1934 to preempt certain state law claims asserted in a "covered class actions" and to provide for the removal to federal court of such actions.[13]

---

**13.** The 1933 Act was amended to provide:
(b) No covered class action based upon the statutory or common law of any State or subdi-

vision thereof may be maintained in any State or Federal court by any private party alleging

*Id.* However, as the SLUSA is expressly limited to class actions, it appears that Congress intended to leave open to plaintiffs the opportunity to bring a state securities claim on their own behalf which would not be held to the stringent standards of the PSLRA. *See also In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096 (D.Nev.1998) (holding before the enactment of the SLUSA that the PSLRA does not impose additional requirements under state law unless adopted by the state legislature). However, because the Court finds the Complaint deficient even under the standards of Rule 9(b) of the Federal Rules of Civil Procedure, it need not determine how Iowa courts would resolve this issue. As outlined above, the Complaint fails to plead with specificity facts supporting its averments of fraud. Therefore, the Court finds that the Count III of the Complaint also fails to state a claim for which relief may be granted.

## V. Damages

With regard to damages, the Complaint simply alleges that "Plaintiff suffered damages in connection with her waiver of her rights under the CIC Plan for the grant of Options." The prayer for relief requests compensatory damages in an amount to be proven at trial, as well as punitive damages. Defendant argues that the Complaint does not allege facts sufficient to support any claim for damages.

The Court believes the cases cited by Defendants in support of their conclusion speak to the elements of damages to be proven at trial, not to what the pleadings must allege to sustain a motion to dismiss. At the pleading stage, a plaintiff need not specify an actual amount of damages or the precise basis on which damages should be determined. A general allegation of damages and causation, such as the Complaint here alleges, is enough. *Franklin High Yield Tax–Free In-* *come Fund v. County of Martin, Minnesota*, 152 F.3d 736, 740 (8th Cir.1998). *See also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1259 (2d ed.1990). While Dr. Martino–Catt's failure to plead the specific amount of her alleged losses weakens her fraud allegations, it is not itself a pleading deficiency.

## VI. Order

The Court finds Counts I and III of the Complaint do not sufficiently plead facts to entitle Plaintiff to relief. However, leave to amend a complaint is to be liberally granted, particularly in cases alleging fraud, to afford Plaintiff an opportunity to comply with the pleading requirements. Fed.R.Civ.Proc. 15(a) (leave to amend to be granted "when justice so requires"); *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C.Cir.1996) ("Leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud.").

Accordingly, Defendants' Motion to Dismiss is **granted**. Counts I and III of the Complaint are hereby dismissed **without prejudice**. Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiff is given leave to amend her Complaint.

IT IS SO ORDERED.

(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
(2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
(c) Any covered class action brought in any State court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to subsection (b). 15 U.S.C. §77p(b) and (c).
The same provisions were added to the 1934 Act at 15 U.S.C. §78bb(f)(1) and (2).