**In re CABLE & WIRELESS, PLC, SECURITIES LITIGATION**

**No. 1:02CV1860 (GBL).**

United States District Court, E.D. Virginia, Alexandria Division.

June 15, 2004.

---

Harvey B. Cohen, Cohen, Gettings & Caulkin, Arlington, VA, Andrew M. Schatz, Esquire, Schatz & Nobel, Hartford, CT, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll West Tower, Washington, DC, Douglas M. McKeige, Berstein Litowitz Berger & Grossman, New York, NY, for Plaintiff's.

Robert H. Cox, Howrey Simon Arnold & White, Washington, DC, for Defense.

## MEMORANDUM OPINION

LEE, District Judge.

THIS MATTER is before the Court on three of Defendants motions to dismiss. The first, is Defendants' Motion to Dismiss the Claims of Foreign Purchasers for Lack of Subject Matter Jurisdiction. The second, is Defendant Cable and Wireless, PLC's Motion to Dismiss the Consolidated Class Action Complaint. The third, is the Individual Defendants' Motion to Dismiss the Consolidated Class Action Complaint. This case concerns a class action securities lawsuit filed against Cable & Wireless,

PLC ("C & W"). In addition to suing C & W, Plaintiffs are also suing two additional defendants in their individual capacities, Graham Wallace and Robert Lerwill.[1] Defendants C & W, Wallace, and Lerwill all seek to Dismiss the Plaintiffs' Consolidated Class Action Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

This case relates to a series of allegedly false and misleading statements made during the Class Period (August 1999 to December 2002) by C & W and its senior officers regarding the company's August 6, 1999 sale of One 2 One, a mobile telecommunications subsidiary, to Deutsch Telecom. Plaintiffs allege that the supposed actions of the Defendants artificially inflated the value of C & W securities.

The issues that exist before this Court are twofold. In analyzing Defendants' Motion to Dismiss the Claims of Foreign Purchasers for Lack of Subject Matter Jurisdiction, the issue is whether any alleged fraudulent conduct by Defendants committed abroad had either a significant effect on American investors or the American securities markets, or whether a substantial amount of Defendants' alleged conduct in furtherance of the allegedly fraudulent scheme occurred in the United States. The Court holds that it does have subject matter jurisdiction over the claims of the foreign purchasers, Plaintiff Ontario Teachers Pension Plan ("OTPP"), because Plaintiffs have successfully pled that a significant amount of allegedly fraudulent conduct occurred in the United States, and this alleged conduct was material to the entire fraud. This United States-based conduct was the alleged capacity swap

transactions which Plaintiffs claim were negotiated and executed in Virginia.

In analyzing both the Motions to Dismiss by C & W and Messrs. Lerwill and Wallace, the issue before the Court is whether Plaintiffs Complaint adequately pleads a federal securities fraud claim, under 15 U.S.C. § 78u–4(b), to withstand Defendants' motions to dismiss for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted. The Court holds that Plaintiffs Complaint does not adequately plead a federal securities fraud claim, as required under Federal Rule of Civil Procedure 9(b) and through the Private Securities Litigation Reform Act, for three reasons. First, the Complaint fails to specify each alleged misleading statement with particularity. Second, the Complaint fails to establish each allegation as a material fact. Third, the Complaint fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly.

Because Plaintiffs have failed to prove a primary violation of the securities laws, the Court holds that their Count II against the individual defendants asserting control person liability under § 20(a) of the Act also fails to state a claim. Regardless, of whether Plaintiffs had proven a primary violation or not, however, Plaintiffs Count II claim fails because they have failed to provide adequate facts to support their allegations of control person liability against the individual defendants.

## I. BACKGROUND

This is a securities fraud case. Cable & Wireless, PLC is a British telecommunications company providing telephone, Inter-

---

1. One of the original named individual Defendants in this action was Sir Ralph Robins. This Court found, in its Order dated May 4, 2004, that it did not have personal jurisdiction over Mr. Robins. Therefore, the Court's analysis in the Individual Defendants' Motion to Dismiss the Consolidated Class Action Complaint will focus solely on Messrs. Wallace and Lerwill.

net, cable television, multimedia, and data transmission services. This securities class action relates to a series of allegedly false and misleading statements made during the Class Period (August 1999 to December 2002) by C & W and its senior officers regarding the company's August 6, 1999 sale of One 2 One (a mobile telecommunications subsidiary) to Deutsch Telekom.

Plaintiffs Consolidated Class Action Complaint brings this action against C & W and three senior officers in the corporation. The senior officers originally involved in this lawsuit are Sir Ralph Robins, formerly a non-executive director and chairman of C & W's Board of Directors, Graham Wallace, formerly C & W's Chief Executive Officer, and Robert Lerwill, formerly Deputy Chief Executive of the Cable and Wireless Group and Executive Director of Finance. In an Order dated May 4, 2004, this Court granted Defendant Robins Motion to Dismiss for Lack of Personal Jurisdiction. This opinion therefore, only applies to Defendants C & W, Wallace, and Lerwill.

Plaintiffs allege that the Defendants inflated the value of C & W securities by making false statements during the class period, from August 6, 1999 to December 6, 2002. Specifically, Plaintiffs allege that Defendants' false and misleading statements concerned C & W's financial results and financial condition. Plaintiffs also claim that Defendants concealed billions of dollars of C & W's liabilities by overstating earnings and overstating assets.

Plaintiffs' claims arise from an aggressive growth strategy C & W embarked on to transform itself from a traditional telecommunications company into a self-proclaimed cutting-edge data and internet protocol provider. *See* Compl. ¶ 38. Plaintiffs allege that this growth strategy was predicated on large acquisitions, which required large amounts of cash. *Id.* ¶¶ 38–

39. In furthering this strategy, in August 1999, C & W sold its interest in One 2 One to Deutsch Telecom ("DT") for £3.45 billion in cash and the assumption by DT of £1.5 billion of One 2 One's debts. *Id.* ¶ 41.

Plaintiffs allege that Defendants misrepresented its financial obligations to One 2 One. C & W, in connection with its sale of One 2 One, had agreed to pay all of the taxes assessed by the United Kingdom's Inland Revenue taxing authorities arising from its past 10–year ownership of One 2 One, as well as all taxes arising from the sale itself. *Id.* ¶¶ 45–47. Plaintiffs also allege that Defendants agreed that, should C & W's debt rating drop below investment grade, C & W would deposit in escrow, for the sole benefit of DT, £1.5 billion in cash to cover any taxes assessed by the United Kingdom. *Id.* Plaintiffs allege that C & W's escrow obligation deprived the company of two-thirds of its cash. According to Plaintiffs, Defendants failed to disclose this information to its investors.

In August 2002, Moody's Investment Service ("Moody's") cut C & W's debt rating to A3, three levels above the trigger. *Id.* ¶ 50. Plaintiffs assert that Defendants should have disclosed its tax indemnity of One 2 One and the £1.5 billion trigger clause at this time. On December 6, 2002, C & W received another downgrade on its long-term rating by Moody's. This time, Moody's downgraded C & W's debt rating to junk status. *Id.* ¶ 54. This downgrade triggered C & W's obligation to place in escrow the previously undisclosed £1.5 billion. *Id.* C & W made a disclosure of both its downgrade by Moody's as well as its obligation to place £1.5 billion in escrow in a press release. As a result of this disclosure, the price of the C & W common stock, traded on the London Stock Exchange, fell from £0.84 to £0.48 on December 9, 2002. The price of the company's American Depositary Receipts ("ADRs"),

which are the equivalent of the ordinary shares in London, but trade on the New York Stock Exchange, also fell from $3.90 to $2.33 on December 9, 2002.

Plaintiffs also allege that the Defendants engaged in "sham capacity swap transactions," which supposedly resulted in an artificial inflation of C & W's earnings. *Id.* ¶ 63. These capacity swap transactions were both to purchase and sell the right to use fiber optic lines. *Id.* at 63–66. According to Plaintiffs, C & W neither needed or wanted these fiber optic lines. *Id.* Plaintiffs allege that these capacity swap transactions had no economic substance, and were conducted simply to artificially inflate C & W's earnings by, according to Plaintiffs, as much as 16 to 32 percent in fiscal year 2002, by over 10 percent in fiscal year 2001, and to account for nearly all the profit in C & W's IP and data services business during the Class Period. Plaintiffs allege that C & W inflated its earnings by immediately recording the sale of the capacity as revenue, but amortizing the purchase of matching capacity, thereby deducting it from income over several years instead of charging it against income in the year acquired. *Id.*

Plaintiffs also allege that Defendants understated C & W's existing obligations for future lease payments by concealing the true amount of the Company's lease liabilities. According to Plaintiffs, Defendants reported in C & W's Form 20–F to the Securities and Exchange Commission ("SEC") that the Company's future lease obligations were £897 million when those obligations were £2.2 billion. *Id.* ¶¶ 90–94.

Plaintiffs, a class of investors and pension funds, now sue. One of the groups of Plaintiff investors is the Ontario Teachers Pension Fund. The OTPP is a Canadian corporation that purchased C & W's securities on the London Stock Exchange. OTPP is seeking to represent a class of purchasers who also purchased securities on foreign exchanges. Defendants, in their Motion to Dismiss the Claims of Foreign Purchasers for Lack of Subject Matter Jurisdiction, argue that this Court does not have subject matter jurisdiction over the claims of the OTPP, as well as any other foreign purchasers who brought C & W securities over a foreign exchange.

In their Motion to Dismiss the Claims of Foreign Purchasers for Lack of Subject Matter Jurisdiction, Defendants argue that the majority of the substantive fraudulent conduct occurred, if at all, in the United Kingdom. Defendants state that they all are foreign entities or citizens. In addition, Defendants argue that its United States-based conduct, if any, was minor and insignificant in relation to the conduct alleged to have been committed abroad.

In addition, Defendants argue that OTPP has not adequately proven that any of its alleged fraudulent overseas conduct had any adverse effect on American purchasers or sellers of securities. Defendants argue that OTPP is a Canadian corporation with its principal place of business in Canada. Defendants contend that any "effect" of its alleged fraud in relation to OTPP occurred in Canada and not the United States.

Finally, Defendants argue that a judgment in this Court against OTPP would not have a *res judicata* effect on a court in England. In other words, if OTPP lost in this Court, it could try the case again in an England court and not be bound by the principles of *res judicata.*

OTPP argues that Defendants' United States-based conduct does, under applicable case law, mandate that this Court has subject matter jurisdiction over their claims. Specifically, OTPP asserts that C & W's capacity swap transactions, which it claims were executed and negotiated in Virginia, mandate the subject matter jurisdiction of this Court over its claims.

OTPP furthermore claims that these swap transactions constituted a substantial portion of the entire alleged fraud. Plaintiffs argue that these transactions were a "sham", and that none of the companies involved in the swaps—either buyer or seller—needed the fiber optic lines. OTPP contends that the purpose of these swaps was simply to artificially boost C & W's balance sheets.

OTPP concedes that the effect of C & W's alleged fraudulent conduct upon United States markets and purchasers does not, on its own, warrant this Court's subject matter jurisdiction over its claims. However, OTPP argues that the alleged fraud *combined* with C & W's conduct warrants the Court's subject matter jurisdiction.

Additionally, OTPP argues that the Defendants' res judicata arguments are speculative and uncertain, and thus invalid under applicable case law. Specifically, OTPP argues that the mere possibility that Defendants might be exposed to multiple suits because a court in England may not recognize a judgment in this action is not sufficient grounds for this Court to dismiss OTPP's claims.

In their Motion to Dismiss, the individual defendants assert that both Plaintiffs' Count I, alleging a primary violation of the Act, and Count II, alleging control person liability under § 20 of the Act, fail to state a claim. Specifically, the Defendants argue that the scienter allegations are deficient in Plaintiffs' pleading of Count I. Defendants state that Plaintiffs have failed to assert both direct knowledge of alleged fraudulent activity against them, as well as, have insufficiently pleaded recklessness allegations.

Defendants also contend that Plaintiffs have failed to state with particularity facts giving rise to scienter. Specifically, Defendants argue that Plaintiffs engage in group pleading, and have not pled in detail, against each individual defendant, its allegations.

Defendants argue that Plaintiffs Count II, alleging control person liability, must fail for three reasons. First, Defendants argue that Plaintiffs cannot allege both § 10(b) and § 20(a) claims against Defendants. Second, Defendants assert that Plaintiffs have failed to allege an underlying violation of the securities laws. Third, Defendants contend that the Complaint does not provide adequate facts to support the allegations of control person liability.

In C & W's Motion to Dismiss, it opines that Plaintiffs fail to plead fraud in relation to the tax indemnity and ratings trigger with particularity. In addition, C & W argues that Plaintiffs fail to identify both its allegations of the capacity swap transactions, or C & W's lease commitments with particularity. For all of Plaintiffs' above allegations, C & W argues that Plaintiffs fail to adequately plead scienter.

With respect to the individual Defendants' Motion to Dismiss and C & W's Motion to Dismiss, Plaintiffs counter that in the context of their lawsuit, group pleading is permissible. Plaintiffs also argue that with respect to Defendants Lerwill and Wallace, they pled with particularity false acts, as well as scienter through recklessness. Specifically, Plaintiffs allege that several statements that Lerwill and Wallace made to stockholders and to the business press were misleading, knowing, and reckless. Plaintiffs argue that these statements were not allowable business puffery.

Plaintiffs also argue that issues regarding C & W's tax indemnification of One 2 One, its escrow ratings trigger associated with this deal, and the capacity swap transactions were far from remote and immaterial. Plaintiffs also contend that Defendants violated generally accepted accounting principles ("GAAP") through its

allegedly misstated information on its tax indemnity, ratings trigger, and capacity swap transactions. According to Plaintiffs, this non-conformity with GAAP creates a strong inference of scienter.

## II. DISCUSSION

### A. Standard of Review

### 1. Subject Matter Jurisdiction Over the Securities Claims of Foreign Purchasers

The federal securities laws provide no indication as to when American federal courts have jurisdiction over securities law claims arising from extraterritorial transactions. In addition, the legislative history of the securities acts does little to illuminate Congress' intent in this area. *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 29–30 (D.C.Cir.1987) ("If the text of the 1934 Act is relatively barren, even more so is the legislative history. Fifty years ago, Congress did not consider how far American courts should have jurisdiction to decide cases involving predominately foreign securities transactions with some link to the United States. The web of international connections in the securities market was then not nearly as extensive or complex as it has become."); *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 173 (5th Cir.1990). Two tests have emerged for determining whether a federal court has subject matter jurisdiction over a foreign plaintiff's claim under the anti-fraud provision of the securities laws. These tests are known as the "effects test" and the "conduct test." *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452, 479 (S.D.N.Y.2001) (citing *Itoba v. Lep Group PLC*, 54 F.3d 118, 121–22 (2d. Cir.1995)).

The effects test asks "whether conduct outside the United States has had a substantial adverse effect on American investors." *Robinson v. TCI/US West Communications, Inc.*, 117 F.3d 900, 905 (5th Cir. 1997). Courts have defined a "substantial adverse effect" as fraud which has adversely effected specific United States investors or parties. The test examines the impact of acts or omissions occurring outside the United States on the American securities market or American investors. *See MCG*, 896 F.2d at 174; *Des Brisay v. Goldfield Corp.*, 549 F.2d 133 (9th Cir. 1977); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d. Cir.1975).

In *Bersch*, the defendant made three separate offerings of shares of an international sales and financial service organization, in which offerings were to take place outside the United States and were not to be offered to any United States citizens, although a number of American citizens had purchased shares in the offerings. The court explained that it must assume that there was some mailing of prospectuses into the United States and some reliance upon them. The Court further held that the overseas dispatch of misleading statements to American residents constituted a satisfaction of the effects test. *Bersch*, 519 F.2d at 991.

The conduct test asks "whether the fraudulent conduct that forms the alleged violation occurred in the United States." *Robinson*, 117 F.3d at 905. Specifically, it applies to claims by foreign investors arising out of foreign transactions where it is alleged that fraudulent acts occurred in the United States. *See MCG*, 896 F.2d at 174. The reasoning supporting this exercise of jurisdiction under this test is that Congress did not intend the United States to be used as a base for fraudulent securities schemes, even when the victims are foreigners. *Bersch*, 519 F.2d at 987 (citing *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d. Cir.1975)).

The Fourth Circuit, nor the Eastern District of Virginia, have adopted the conduct or effects tests. Other circuits in the Courts of Appeals are split as to how to

apply the conduct test. The most restrictive views of the effects test are in the Second and the District of Columbia Circuits. These circuits hold that subject matter jurisdiction over foreign acts of securities fraud exist only if the United States-based conduct was more than just "preparatory," and the defendant's acts, or culpable failures to act, within the United States directly caused the foreign investors losses. *Bersch,* 519 F.2d at 987, 993; *see also Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1045 (2d. Cir.1983) ("[Thus], foreign plaintiffs' suits under anti-fraud provisions of the securities laws [will] be heard only when substantial acts in furtherance of the fraud were committed within the United States ... activities which are 'merely preparatory' will not support jurisdiction in and of themselves"); *see also Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 33 (D.C.Cir.1987). The Fifth Circuit has also adopted the Second Circuit's application of the conduct test. *Robinson,* 117 F.3d at 906.

The Third, Seventh, Eighth, and Ninth Circuits have all employed a more relaxed standard which generally requires some lesser degree of conduct than the "direct causation" test used by the Second, Fifth, and District of Columbia Circuits. The Third Circuit engages the most relaxed standard of the conduct test. The Third Circuit holds that it has subject matter jurisdiction in cases involving transnational securities cases where at least *some* conduct occurs in the United States. *See SEC v. Kasser,* 548 F.2d 109, 114 (3d. Cir. 1977).

The Seventh, Eighth, and Ninth Circuits employ a standard more strict than the Third Circuit but not as rigorous as the Second, Fifth, and District of Columbia Circuits. The Seventh Circuit holds that "[w]hen the conduct occurring in the United States is *material* to the successful completion of the alleged scheme, [subject matter] jurisdiction is asserted." SDN *BHD v. Sternberg,* 149 F.3d 659, 666–67 (7th Cir.1998) (quoting *Tamari v. Bache & Co. S.A.L.,* 730 F.2d 1103, 1108 (7th Cir. 1984) (emphasis added)). The Eighth Circuit's interpretation of the conduct test is somewhat similar. In *Travis v. Anthes Imperial Limited,* 473 F.2d 515, 524 (8th Cir.1973), the court held, "[Subject matter jurisdiction] attaches whenever there has been *significant* conduct with respect to the alleged violations in the United States. And this is true even though the securities are foreign ones that had not been purchased on an American exchange." (emphasis added) The Ninth Circuit has also interpreted the conduct test in a similar fashion, holding that the defendants conduct was sufficient to establish subject matter jurisdiction where the United States-based conduct was, "significant with respect to the alleged violation ... and furthered the fraudulent scheme." *Grunenthal GmbH v. Hotz,* 712 F.2d 421, 425 (9th Cir.1983) (quoting *Continental Grain Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 420 (8th Cir.1979)). The Third, Seventh, Eighth and Ninth Circuits all employ an application of the conduct test, which is significantly less rigorous than that used by the Second, Fifth and District of Columbia Circuits, which hold that the United States-based conduct must be more than just "preparatory" and must have had a direct causation on the foreign investors losses.

Some courts have held that subject matter jurisdiction will exist over a transnational securities fraud claim if the non-movant satisfies either the effects or the conduct test. *Tri–Star Farms Ltd. v. Marconi PLC,* 225 F.Supp.2d 567, 573 (W.D.Pa.2002). However, in *Itoba Ltd.,* the Second Circuit held that the effects and conduct test need not "be applied separately and distinctly from each other" and that, in fact, "an admixture or combination

of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Itoba Ltd.,* 54 F.3d at 122. The United States Court of Appeals for the Fourth Circuit has not indicated a preference for one test over the other, or an advocacy of an intermixing of the tests, as held in *Itoba, Ltd.*

### 2. Fed.R.Civ.P. 12(b)(6)—Failure to State a Claim Upon Which Relief May Be Granted

A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, ·2 L.Ed.2d 80 (1957). In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 627 (E.D.Va.2000). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *In re MicroStrategy,* 115 F.Supp.2d at 627 (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)). However, conclusory allegations regarding the legal effect of the facts alleged need not be accepted. *See Labram v. Havel,* 43 F.3d 918, 921 (4th Cir. 1995). Because the central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendants to prepare a fair re-sponse. *Conley,* 355 U.S. at 47, 78 S.Ct. 99; *see also Glaser v. Enzo Biochem, Inc.,* 303 F.Supp.2d 724, 730–31 (E.D.Va.2003). This initial standard sets out how the Court construes the Complaint. The following standard of review sections provide the substance the Court utilizes in analyzing a 12(b)(6) motion. The substantive pleading standard is set forth in Section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5, and the Private Securities Litigation Reform Act.

### 3. Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 & Fed. R.Civ.P. 9(b)

To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and under Rule 10b–5, 17 C.F.R. § 240.10b–5, a plaintiff must allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiable relied (4) that proximately caused the plaintiff damages." *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 342 (4th Cir.2003) (quoting *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir. 1999)); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

To allege a false statement or omission of material fact, a plaintiff "must point to a factual statement or omission—that is, one that is demonstrable as being true or false." *Longman v. Food Lion, Inc.,* 197 F.3d 675, 682 (4th Cir.1999). Additionally, the plaintiff must allege that the statement is false or that the omitted fact renders a public statement misleading. *See Id.* Additionally, "any statement or omission of fact must be material," in other words, there must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the

security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* at 682–83.

In a securities fraud action, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see Malone v. Microdyne Corp.,* 26 F.3d 471, 478 (4th Cir. 1994). Mere negligence does not constitute scienter. *See Phillips,* 190 F.3d at 621. The Fourth Circuit has held that a securities fraud plaintiff may allege scienter by pleading not only intentional misconduct, but also recklessness. *Ottmann,* 353 F.3d at 344. The Fourth Circuit has also defined "recklessness" as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 343; see also *Phillips,* 190 F.3d at 621.

Section 20(a) of the Exchange Act imposes liability upon controlling persons of Defendants found to be in violation of the Act. Section 20(a) of the Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The Court's analysis of a standard of review for Section 20(a) must begin with the plain language of Section 20(a) itself. "[W]here . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to the terms.'" *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Consequently, "when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning in all but the most extraordinary circumstance, is finished." *Metropolitan Stevedore Co. v. Rambo,* 515 U.S. 291, 294, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995) (quoting *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992)).

Here, on its face, Section 20(a) imposes secondary liability to "[e]very person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" and instructs that such liability be imposed "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Thus, Section 20(a) clearly assigns secondary liability upon a demonstration of a primary violation by the controlled person and of direct or indirect control by the controlling person, subject only to a 'proviso' in the nature of an affirmative defense that the controlling person acted in good faith. It does not prescribe culpability as a prima facie element of secondary liability; rather, it provides for an exception to liability where there is no culpability on the part of the defendant." *In re MicroStrategy,* 115 F.Supp.2d at 659.

Both 10(b) and 20(a) claims generally involve allegations of fraud, and a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstances consti-

tuting fraud ... be stated with particularity" in the complaint. Fed.R.Civ.P. 9(b).

Section 10(b) provides the standards for pleading a fraud case; however, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss in the Private Securities Litigation Reform Act.

### 4. The Private Securities Litigation Reform Act (PSLRA)

The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u–4(b). The PSLRA also requires that the complaint in a securities fraud case "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required state of mind is scienter. *See Ottmann,* 353 F.3d at 344.

■ Although the words "facts" and "particularity" are not defined in the statute, their meaning is plain. Where the statutory language is plain and unambiguous, further inquiry is not required. *Santa Fe Medical Servs. v. Segal (In re Segal),* 57 F.3d 342, 346 (3d Cir.1995). A "fact" is an "event or circumstance," *see Black's Law Dictionary* 591 (6th ed.1990), or "a truth known by actual experience or observation," *see Random House College Dictionary* 473 (rev. ed.1980). "Particularity" refers to "the quality or state of being particular," i.e., "dealing with or giving details; detailed; minute; circumstantial." *Id.* at 969. A complaint that fails to comply with these requirements must be dismissed on defendant's motion. *See* 15

U.S.C. § 78u–4(b)(2); *In re MicroStrategy,* 115 F.Supp.2d at 628.

■ The Fourth Circuit has adopted a standard as to what a "strong inference" means within the PSLRA. In *Ottmann,* the Fourth Circuit held that courts should employ a case-specific analysis in examining scienter pleadings. *Ottmann,* 353 F.3d at 345. In addition, "courts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter. And, while particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case." *Id.* at 345–46. The Fourth Circuit has held that the required state of mind, or scienter, for securities fraud liability is recklessness or intentional misconduct. *See Ottmann,* 353 F.3d at 344. Recklessness must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips,* 190 F.3d at 621; *accord In Re MicroStrategy,* 115 F.Supp.2d at 633; *Arnlund v. Deloitte & Touche LLP,* 199 F.Supp.2d 461, 474 (E.D.Va.2002).

The purpose of the heightened pleading requirements of the PSLRA is to discourage speculative lawsuits. "The PSLRA raised [Rule 9(b)'s] pleading requirements in securities fraud actions precisely to discourage frivolous, speculative lawsuits." *In re Digital Island Sec. Litig.,* 223 F.Supp.2d 546, 551 (D.Del.2002), *aff'd,* 357

F.3d 322 (3d. Cir.2004); *see also Phillips,* 190 F.3d at 615 ("hyperbole and speculation cannot give rise to a claim of securities fraud.")

Putting it all together, the Court must first analyze the Complaint statement-by-statement and look at whether each fraud allegation meets the initial pleading standard under the PSLRA. The question is whether the Complaint alleges the misleading statements, the reason or reasons why the statements are misleading, and states all the facts, with particularity, on which that belief is formed. Second, the Court must inquire into whether the allegedly misleading statements are material. Third, the Court must take all circumstances into account and analyze whether there is a strong inference of recklessness (scienter). Fourth, the Court must determine if the plaintiff has pled loss and transaction causation.

## B. Analysis

### 1. Subject Matter Jurisdiction Over the Securities Claims of Foreign Purchasers

The Court concludes that the Defendants' alleged United States-based conduct, the fiber optic capacity swap transfers, is sufficient for this Court to exercise subject matter jurisdiction because a part of the alleged conduct occurred in Fairfax County, Virginia, and the conduct which occurred was significant to the entire allegedly fraudulent scheme. Specifically, this alleged conduct is sufficient for the Court's exercise of subject matter jurisdiction for two reasons. First, the conduct was significant, in that it involved transactions worth hundreds of millions of dollars. Second, the alleged conduct was substantial or material to the larger scheme, which was to allegedly artificially inflate C & W's profit earnings.

As outlined in the Standard of Review, the Court has subject matter jurisdiction over securities law claims arising from extraterritorial transactions only in limited circumstances. For this Court to have subject matter jurisdiction in this situation, Defendants' conduct must have met one of the following two tests. Either Defendants' allegedly fraudulent conduct outside the United States has to have had a substantial adverse effect on American investors, or part of the fraudulent conduct that forms the alleged violation has to have occurred in the United States. *See Robinson,* 117 F.3d 900, 905.

Various Courts of Appeals have disagreed as to the extent of domestic conduct that will trigger subject matter jurisdiction over foreign and domestic securities fraud claims. At one end of the spectrum, is the rationale of the Second, Fifth, and District of Columbia Circuits, which hold that a defendant's allegedly fraudulent conduct in the United States must amount to more than just actions which are "merely preparatory", and not insubstantial when compared with the conduct committed abroad, and the *direct* cause of the losses sustained by the foreign investors. *See, e.g., Bersch,* 519 F.2d at 987, 993. At the other end of the spectrum is the rationale of the Third, Seventh, Eighth and Ninth Circuits, which hold in essence, that a defendant's conduct must be significant in scope, as well as a substantial when compared to the entire fraud. *See, e.g., Kasser,* 548 F.2d at 114; *BHD,* 149 F.3d at 666–67; *Travis,* 473 F.2d at 524; *Grunenthal GmbH,* 712 F.2d at 425. The Fourth Circuit, nor this Court prior to this case, has commented on the application of this test.

■ Based on the underlying policies surrounding the Exchange Act, this Court adopts a combination of the "middle ground" approach to the conduct test employed by the Seventh, Eighth, and Ninth Circuits. The approaches used by the Second, Fifth, and District of Columbia Cir-

cuits are too rigid. These approaches allow some United States based fraudulent conduct, which is significant to the larger scheme but is not the direct cause of the investor loss, to go unchallenged, which was not Congress' intent in legislating the Exchange Act. "In our view, the absence of all but the most rudimentary Congressional guidance counsels that federal courts should be cautious in determining that transnational securities matters are within the ambit of our antifraud statutes. Nevertheless, we would do serious violence to the policies of these statutes if we did not recognize our Country's manifest interest in ensuring that the United States is not used as a 'base of operations' from which to 'defraud foreign securities purchasers or sellers' ... This interest is amplified by the fact that we live in an increasingly global financial community." *BHD*, 149 F.3d at 667 (quoting *Kasser*, 548 F.2d at 116). The Third Circuit approach is too lenient. It provides the Court's subject matter jurisdiction in cases where *any* fraudulent conduct occurred in the United States, regardless of whether it had a significant or substantial effect on the larger fraud or not. Cases from the Third, Seventh, Eighth, and Ninth Circuits strike the correct balance. These circuits have all held, to various degrees, that a court has subject matter jurisdiction over securities law claims arising from extraterritorial transactions when a defendant's United States based conduct was (1) significant and (2) substantial or material to the larger scheme. *See, e.g., Kasser*, 548 F.2d at 114; *BHD*, 149 F.3d at 666–67; *Travis*, 473 F.2d at 524; *Grunenthal GmbH*, 712 F.2d at 425.

■ Defendants alleged United States conduct, the allegedly inflationary financial reporting of fiber optic capacity swap transfers, part of which occurred in Virginia, meet the test enunciated above to trigger subject matter jurisdiction of this Court over the claims of the OTPP and the other foreign purchasers. The alleged C & W conduct was significant, in that it involved transactions worth hundreds of millions of dollars. The conduct, which Defendants concede occurred, took place in its Virginia offices. *See* Mem. of Law in Supp. of Defs. Motion to Dismiss the Claims of Foreign Purchasers for Lack of Subject Matter Jurisdiction at 5. For instance, Plaintiffs allege that in September 2001, C & W entered into a capacity swap transaction with Quest for $49 million. Compl. ¶ 76. Plaintiffs contend that Defendants, in the first fiscal quarter of 2001, entered into another swap transaction with Quest in which C & W agreed to allow Quest to port fiber optic transmission capacity. This transaction totaled $68.9 million. *Id.* ¶ 84. Plaintiffs also allege that Defendants entered into "side agreements" to financially cover its capacity swap transactions. According to Plaintiffs, "[C & W Senior Vice President] Alan Coe negotiated portability side agreements with Gary Casey, Quest's Executive Vice President ... to cover C & W's March 2000 $109 million swap of capacity with Quest." *See* Pls. Opp. at 63; Compl. ¶ 85.

In addition to this conduct being significant, Plaintiffs also successfully allege that the conduct was substantial or material to the larger scheme. Defendants argue, in rebuttal, that the majority of the alleged fraudulent scheme occurred, if at all, in the United Kingdom. Defendants also argue that Plaintiffs allege no fraudulent statements by United States persons or entities, and that the Defendants are all foreign entities or citizens. Most of the alleged fraudulent acts that Plaintiffs claim Defendants engaged in did occur in the United Kingdom, and the Defendants are all either United Kingdom entities or citizens. However, a substantial part of the entire alleged fraudulent scheme occurred in the United States. Plaintiffs' Complaint alleges that C & W's revenue and earnings

reported in C & W's SEC filings and in other public statements and reports were materially overstated for at least two years, because Defendants allegedly included hundreds of millions of dollars in fictitious revenue from the capacity swap transactions. Plaintiffs also allege that Defendants overstated C & W's income by amortizing the expenses from the purchase side of the swaps while immediately recognizing the revenue on the sale side of the swap. See Compl. ¶¶ 63, 67, 98, 99, 102, 112, 113, 114, 116 120, 126. This was all conduct that allegedly occurred in the United States, specifically at C & W's headquarters in the Eastern District of Virginia. Under the test enunciated above, based upon this alleged conduct, this Court has subject matter jurisdiction over the claims of the Plaintiff foreign purchasers of C & W securities in this suit.

Plaintiffs in essence concede that the purported "domestic effects" of the Defendants' alleged fraud, standing alone, are insufficient to establish jurisdiction over the claims of the foreign purchasers. Plaintiffs state, "[We] do not contend that the effects on U.S. markets and purchasers, standing alone, provides the Court with a basis for finding subject matter jurisdiction over the claims of Foreign Purchasers ..." Pls. Opp. at 63. Plaintiffs contend that jurisdiction is proper when these domestic effects are combined with the Defendants' allegedly fraudulent United States-based conduct. *Id.* at 63–64.

Plaintiffs base their position, that this Court has subject matter jurisdiction upon the claims of the foreign purchasers based on the intermixing of both conduct and effects, upon the holding in *Itoba,* which states, "[t]here is no requirement that these two [conduct and effects] tests be applied separately and distinctly from each other." *Itoba,* 54 F.3d at 122. The Court finds this argument unpersuasive. *Itoba's*

holding is fact-specific, and the facts in *Itoba* are not analogous to Plaintiffs' here. In *Itoba,* the illegal activity abroad caused a substantial effect within the United States. *See Alfadda v. Fenn,* 935 F.2d 475, 478 (2d. Cir.1991). In *Itoba,* a British-based issuer of stock was found to be subject to United States securities fraud laws based upon its submission to the SEC a Form 20–F, which is a public document that discloses material financial information. *Itoba* involved a single, foreign plaintiff that purchased shares on a foreign exchange and purchased the stock on behalf of its American parent company. *Itoba,* 54 F.3d at 122. The Court held that it was the "American" parent that financed the deal, based on Defendants misrepresentations to the SEC, and whose mostly American shareholders who ultimately bore the loss from the alleged misrepresentations.

This substantial effect upon United States investors and markets is missing from Plaintiffs' case. Unlike *Itoba,* there are no great numbers of Americans who were adversely affected by C & W's alleged actions. The threshold that the Plaintiffs met in *Itoba,* simply to have the court consider an intermixing of the conduct and effects tests, was not met here because Defendants' actions simply did not effect a great deal of Americans nor did they impact American markets.

Regardless however, of Plaintiffs failure to meet the effects test or the intermixing of both effects and conduct as stated in *Itoba,* Defendants' domestic conduct alone gives this Court subject matter jurisdiction over the foreign purchaser Plaintiffs' claims. *See Robinson,* 117 F.3d at 905; *Zoelsch,* 824 F.2d at 30 (holding that the securities laws are applicable if either the conduct or the effects test so indicates.)

In addition, the Court holds that Defendants' *res judicata* arguments are specula-

tive and uncertain, and thus invalid under applicable case law. Defendants attached a declaration of Lord Grabiner QC, an English barrister. Lord Grabiner opined that there is a substantial risk that an English court would refuse to recognize a judgment entered in this action if a foreign class member were to later bring a similar proceeding in England. Defendants argued that an English court would not recognize this Court's judgment for three reasons. First, an English court would likely find that this Court was not a "court of competent jurisdiction" to adjudicate the claims of United Kingdom resident purchasers because those purchasers had no notice of the proceedings and/or did not give their consent to be represented. Cox. Decl. Ex. H. Second, English courts award foreign judgments *res judicata* effect only if the foreign proceedings and the English proceeding involved the same "cause of action," and an English court is unlikely to regard the United States class action as the same "cause of action" as any that would be available in English proceedings. Defendants also argue that it is unlikely that an English court would allow the Defendants to rely on the doctrine of issue estoppel or claim preclusion. *Id.* Third, there is a substantial risk that an English court would refuse to give the judgment *res judicata* effect because the United States action and any English action would not involve the same "parties or privies." *Id.*

As a result of the above arguments, Defendants contend, foreign class members who have not directly participated in the class action and are unhappy with the results of the United States litigation, or who are unaware of the United States litigation, could simply file another lawsuit in the English courts.

Defendants arguments are unpersuasive to the Court. The main crux of Defendants' argument is that the claims of the foreign purchasers should be dismissed for lack of subject matter jurisdiction because a court in England may not recognize a class action judgment entered by this Court. Defendants submit the opinion of Lord Grabiner, who states that there is a "substantial" risk that an English court will not recognize a United States judgment, thereby exposing defendants to multiple lawsuits. Lord Grabiner states that an English court may not recognize the Court's judgment because English class members will not have received actual notice of this action. See Grabiner Decl. at ¶¶ 14, 19, 32. This opinion ignores the requirements of Federal Rule of Civil Procedure 23 and due process. Rule 23(c)(2) requires notice to members of a certified class informing them of the pendency of the class action. This notice is a fundamental element of due process. Rule 23(c)(2) states:

> In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under circumstances, including individual notice to all members who can be identified through reasonable efforts. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel.

Paragraph 36 of the Complaint specifically alleges that, once a class is certified, actual notice will be provided using the customary means of doing so.

Defendants also cite the "mere possibility" that they may be exposed to multiple suits because a court in England may not recognize a judgment in this action. This

argument also is unpersuasive. The *Cromer* court addressed this issue and drew a distinction from "those circumstances in which there is a *possibility* that a foreign court may not recognize a judgment, and those in which there is a *near certainty* that [a U.S. judgment] will not be recognized." *Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 134–35 (S.D.N.Y. 2001) (emphasis added) (citing *Bersch*, 519 F.2d at 996). The possibility of an English court failing to give *res judicata* to a judgment of this Court is not a near certainty. Defendants themselves contend that it is only a mere possibility. To hold that this Court does not have subject matter jurisdiction over the claims of the foreign purchasers, based on *res judicata* grounds and a mere possibility, in essence weakens, if not altogether removes, the jurisdiction that this Court has on *any* claims involving non-American parties.

### 2. 10(b) and 20(a) Claims Against Defendants

The Court holds that Plaintiffs fail to state a claim against Defendants Lerwill and Wallace under § 10(b) of the Securities Act for three reasons. First, Plaintiffs fail to prove that Defendants Lerwill and Wallace made false statements. All of the statements Plaintiffs attribute to the individual defendants, in regards to all of the allegedly fraudulent actions at C & W, were innocuous business puffery. Second, Plaintiffs fail to prove either a direct action, or recklessness, of Defendants Lerwill and Wallace to constitute scienter, the required state of mind for securities fraud liability under the Securities Act. Third, Plaintiffs fail to plead their allegations against Defendants Lerwill and Wallace with the proper degree of particularity. Specifically, Plaintiffs engage in group pleading, instead of setting out with particularity each defendant's culpable conduct.

■ As stated earlier, in order to state a claim under § 10(b), Plaintiffs must allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff damages." *Ottmann*, 353 F.3d at 342. In addition, Plaintiffs must, under PSLRA, "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind [scienter]." 15 U.S.C. § 78u–4(b)(2).

### A. False Statements and Materiality

■ The Court holds that Plaintiffs have not adequately pled that the individual defendants, nor C & W as a corporate entity made false or misleading statements to investors or potential investors for two reasons. First, the majority of the fraudulent statements that Plaintiffs plead in their Complaint against all Defendants are permissible business puffery. Second, Plaintiffs attribute statements published in the newspapers and other media to Defendants. The Court cannot consider these statements because various courts have held that statements published in newspapers and other media cannot be attributed to a defendant in a securities fraud action.

### i. Permissible Business Puffery

The Court holds that the majority of the fraudulent statements that Plaintiffs plead in their Complaint against all Defendants are permissible business puffery. Courts have demonstrated a willingness to find immaterial, as a matter of law, a certain kind of rosy affirmation commonly heard from corporate managers and familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the

total mix of information available. *See Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir.1994) (the alleged fraudulent statement here was: "[the company] is on target toward achieving the most profitable year in its history"); *San Leandro Emergency Med. Plan. v. Philip Morris*, 75 F.3d 801, 807, 811 (2d Cir.1996) (holding not actionable statement that the company "expect[ed] ... another year of strong growth in earnings per share"); *In re Caere Corporate Sec. Litig.*, 837 F.Supp. 1054, 1057–58 (N.D.Cal.1993) ("[The company is] 'well positioned' for growth."); *Colby v. Hologic, Inc.*, 817 F.Supp. 204, 211 (D.Mass.1993) ("Prospects for long term growth are bright.")

◼ The Fourth Circuit has also held that soft, puffing business communications and statements, like those profiled above, do not demonstrate falsity. *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir.1992). These type of statements also generally lack materiality. For a false statement to be material, the Fourth Circuit has held that it must be "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman*, 197 F.3d at 682–83.

In *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256 (4th Cir.1993), the court held that commercial puffery lacks, as a matter of law, the materiality to be actionable. In *Cooke*, the Fourth Circuit reversed in part the District Court's grant of summary judgment against the plaintiff. Among the statements challenged by plaintiffs in *Cooke* were representations of specific business projects including "negotiations with an insurance company that would act as a guarantor" on the company's loans and a repurchase by the company of some 400,000 shares of its own stock "because it was an attractive investment." *See Cooke*, 998 F.2d at 1259. The *Cooke* court held that the likelihood of a misleading representation was greater in these circumstances than in a case where soft forecasting, or puffery, was all that was involved.

◼ None of the statements in Plaintiffs' Complaint attributed to Defendant Wallace support a claim because they are not the type of statements that are actionable under § 10(b). The following statements, which Plaintiffs contend are false statements, amount to little more than inactionable puffery or corporate optimism. *See* Compl. ¶ 103 ("these results demonstrate healthy growth and exceptionally strong finances"); *Id.* ¶ 119 ("we are achieving our objectives ... [C & W's] unique financial strength is a fundamental advantage as the shakeout in our sector continues"); *Id.* ¶ 125 ("our current strong net cash position of £2.2 billion remains a source of competitive advantage with our corporate customers"); *Id.* ¶ 129 ("results are in line with our expectations ..." "Revenues ... have continued to grow ..." "Maintain our strong Group net cash position as a source of competitive advantage with our corporate customers"). These statements are not material.[2]

2. In most circumstances, disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact. *See Basic Inc. v. Levinson*, 485 U.S. 224, 236, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). But not every unfulfilled expression of corporate optimism, even if characterized as mis-

statement, can give rise to a genuine issue of materiality under the securities laws. *Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 176 (1st Cir.1994) (leaving open possibility that some materiality determinations may be made as a matter of law.)

The Court holds that C & W's generally rosy statements, such as "healthy growth," "achieving our objectives ..." and "competitive advantage" are puffery are not actionable as false statements under the securities laws. *See, e.g., Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996); *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 288–90 (4th Cir.1993). In *Raab,* a plaintiff alleged securities fraud against a defendant based in part on statements made in the defendant's annual report. In the defendant's annual report, it predicted an "expected annual growth rate of 10% to 30% over the next several years." *Id.* at 289. The Fourth Circuit held that statements such as these are "soft" and "puffing" and are not actionable under the securities laws. *Id.* at 289. Plaintiffs, in rebuttal, cite *In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 319 (E.D.N.Y.2002) (quoting *Shields v. Citytrust Bancorp,* 25 F.3d 1124, 1129 (2d. Cir.1994)), which holds that puffery is acceptable only "[if] the company has some legitimate reason to be optimistic." Plaintiffs assert that Defendants Wallace and Lerwill knew of the tax indemnity, the ratings trigger, and the lease commitments, which all had the potential to negatively effect C & W's financial position. Knowing this, Plaintiffs argue, Defendants Wallace and Lerwill continued to make the type of optimistic comments cited above.

Even under *CINAR,* Defendants had, as most corporate executives do, some legitimate reason for optimism. The market actions which would have to occur in order to initiate both the tax indemnification and escrow trigger were both contingencies. In other words, the tax indemnity and cash trigger were all possibilities, they were not definite. Courts have held that defendants do not have a duty to disclose a contingent liability, if the liability is unlikely to occur. *See, e.g., In re Xonics Photochemical, Inc.,* 841 F.2d 198, 199–200 (7th Cir.1988). Un-

fortunately, the telecommunications market, of which C & W was a major part of and the individual defendants corporate officers in, crashed during the Class Period. Plaintiffs have failed to prove that any of the Defendants knew, prior to the downfall in the telecommunications market, that any of these contingent events, such as the tax indemnity and the cash trigger, were certain to occur and thus were reportable to investors. Defendants were involved in activities that constituted permissible day to day management of the company.

All of the statements Plaintiffs attribute to Defendants as violations of the securities laws are "soft" and "puffery" as defined in cases such as *Howard,* and thus do not demonstrate falsity. Because all of these soft statements Plaintiffs cite are therefore, one a reasonable investor would expect a corporate officer to state about his or her company in public, there is no substantial likelihood that a reasonable purchaser or seller of a security would have considered the statements Plaintiffs allege important in deciding whether to buy or sell the security or would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

Additionally, this case before the Court is not like the *Cooke* exception to *Howard,* described above. In this case, the individual defendants are all alleged to have made statements concerning the future growth of the company. Defendants here, unlike *Cooke,* did not make specific statements as to any business projects.

██ The only statement attributable to Defendant Wallace containing "hard" financial data alleged to be misleading is a press release dated February 20, 2002 in which Defendant Wallace stated that "[a]ctual cash at the end of January was £6.6 billion with borrowings of £2.6 billion having returned £0.5 billion to shareholders at

that time by way of a continuing share buy-back." Compl. ¶ 119. Plaintiffs argue that this statement is indicative of improper accounting, of which the individual defendants were a part of. Although this may, unlike the other statements Plaintiffs cite by the individual Plaintiffs, be a "hard" statement concerning financial data, Plaintiffs have not pled that Defendant Wallace knew this statement was false or misleading at the time he made it. In addition, Plaintiffs have failed to adequately plead any claims they have regarding improper accounting.

### ii. Newspaper and Other Media Statements Attributed to Defendants

The Court holds that Plaintiffs cannot attribute any statements published in newspapers or other media to Defendants. These type of statements are not material nor false, and the Court will not consider them.

■ The Fourth Circuit has held that a defendant cannot be held liable for statements that appear in newspapers. A defendant cannot be held liable for his quotes in the media even if that statement is directly attributed to the defendant—absent a showing that the defendant "controlled" the newspaper. *See Raab*, 4 F.3d at 288; *Hillson*, 42 F.3d at 216 n. 10; *accord In re Newbridge Networks Sec. Litig.*, 926 F.Supp. 1163, 1171 (D.D.C.1996) (plaintiff must allege defendants had control over final version of the article because the speaker might be quoted incorrectly or out of context.)

The Complaint also attempts to attribute statements published in newspapers to the Defendants. Plaintiffs plead, "The Herald (Glasgow) reported that 'Graham Wallace indicated [that] he fervently believes that cash is king and that Cable and Wireless is Lord of all it surveys' ... In the current market all kinds of opportunities are coming to the fore and, obviously,

being cash-positive puts us in a very advantageous position," a[C & W] spokesman [told The Times (London)]." Compl. ¶ 106. The Court cannot consider any of these statements published by newspapers and attributed to Defendants.

### B. Scienter

■ The Court holds that Plaintiffs fail to adequately plead the requisite state of mind, scienter, against Defendants Lerwill, Wallace, and C & W for two reasons. First, the facts that Plaintiffs plead regarding Defendants' business decisions related to C & W's tax indemnification of One 2 One and the ratings trigger associated with that deal, and its business decisions relating to the reporting of the capacity swap transactions and lease commitments do not support a strong inference of conduct so highly unreasonable and such an extreme departure from the standard of ordinary care. Second, even if Plaintiffs have proven that Defendants violated GAAP principles, these lapses alone are not sufficient, absent any other strong evidence of wrongdoing, to establish the strong inference of scienter required by the PLRSA.

To demonstrate recklessness, Plaintiffs must assert facts supporting a strong inference of conduct "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621. It bears emphasis that simple, or even inexcusable, negligence will not suffice to meet this demanding standard. *Id.; Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977) (test "should not be a liberal one lest any discernable distinction between 'scienter' and 'negligence' be obliterated.")

*i. Recklessness—C & W's Tax Indemnification of One 2 One and the Ratings Trigger*

Plaintiffs fail to adequately plead that any conduct Defendants engaged in related to the tax indemnification of One 2 One and the ratings trigger associated with this deal were nothing more than at the worse, bad business judgment. In addition, the Complaint fails to meet the standard of recklessness because the statements lack materiality and were not false when made as explained above. Plaintiffs have not plead that the business decisions that Defendants made regarding these issues was conduct highly unreasonable and such an extreme departure from the standard of ordinary care a reasonable business director or officer would employ.

Specifically, in a section of Plaintiffs' Complaint entitled "Knowledge or Reckless Disregard for the Truth," *See* Compl. ¶ 135, Plaintiffs allege that Defendants knew of the tax indemnification and ratings trigger, knew that the ratings trigger could be triggered by a downgrade of C & W's debt rating, and knew of the "turmoil in the telecommunications industry, and that [C & W's] financial performance had suffered a significant downturn; as a result, they knew or were at least reckless in knowing that the likelihood of debt ratings downgrades was increasing." Compl. ¶ 135(d).

■ Defendants' failure to disclose contingent liabilities when there was no reason to believe the contingency would manifest itself at the time the statement was made is not recklessness. This situation before the Court is analogous to *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1267–68 (10th Cir.2001), where the Tenth Circuit held that defendants failure to disclose to investors potential liability of $445 million was not so obvious that nondisclosure constituted recklessness. As in this case, both the tax indemnification and the ratings trigger were based on contingent outside market factors. Similarly, in *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 962 (5th Cir.1981), the court held that the company's failure to disclose potential liabilities to investors was a demonstration only of negligence, not of recklessness.

■ Viewing the Complaint in a light most favorable to Plaintiffs, arguably, Defendants Lerwill and Wallace's behavior may reflect bad business judgment. However, as executives and officers of C & W, Defendants Lerwill and Wallace were within their right not to publicize this information. As the Supreme Court has held, claims that "constitute no more than internal corporate mismanagement" are not actionable under the securities laws. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *see Fitzer v. Sec. Dynamics Techs*, 119 F.Supp.2d 12, 31 (D.Mass.2000) ("poor management is a risk that every investor takes [,] ... [and][d]amages flowing therefrom are not actionable under the securities laws.") This Court has also held that mere corporate mismanagement is not actionable under the securities laws. *See Weill v. Dominion Res., Inc.*, 875 F.Supp. 331, 336 (E.D.Va.1994) (dismissing complaint without leave to amend because the allegedly fraudulent omissions were not actionable and "at most amount[ed] to nothing more than mere corporate mismanagement"). At worse, Defendant Lerwill and Wallace's behavior is negligent. However, Defendants Lerwill and Wallace's behavior does not constitute recklessness. Congress did not intend for the securities laws to be used by investors to play "Monday morning quarterback" on the legitimate business decisions, however bad, of company officers and executives.

*ii. Capacity Swap Transactions*

The Court also holds that Plaintiffs' allegations of Defendants' fraudulent conduct

are not reckless within the meaning of the Securities Act, because Plaintiffs fail to state any facts which lead the Court to draw a strong inference of conduct so highly unreasonable and such an extreme departure from the standard of ordinary care on the part of Defendants. As stated above, to demonstrate recklessness, Plaintiffs must assert facts supporting a strong inference of conduct "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips,* 190 F.3d at 621.

Plaintiffs allege that the purpose of the capacity swap transactions, was to buy and sell fiber optic lines, which it claimed neither C & W nor the companies in which it negotiated with either wanted or needed. In turn, Plaintiffs allege, Defendants designed these transactions to artificially inflate C & W's financial records, which would in turn create a false upbeat picture to investors, encouraging the price rise of C & W's stock.

Plaintiffs contend that the Defendants actual knowledge that it was misstating its earnings, through use of the capacity swap transactions, is evident. Plaintiffs argue that Congress made a finding that C & W entered fraudulent capacity swaps with side agreements. *See* Compl. ¶ 83. In addition, Plaintiffs contend that C & W maintained a separate set of books for the capacity swaps. *Id.* ¶ 64. That C & W's purchase and sale of these capacity swaps were unneeded and unwanted. *Id.* ¶ 65. That C & W accepted money unconnected to the value of a particular transaction. *Id.* ¶ 76. Plaintiffs also allege that a former C & W executive stated that the capacity swaps were simply to meet financial forecasts. *Id.* ¶ 114. However, this statement was pulled from an article in *The Finan-*

*cial Times.* Plaintiffs also allege that Defendant Lerwill was personally aware of the capacity swaps, and had to approve these transactions. *See Id.* ¶¶ 64, 76, 84, 85.

Plaintiffs' allegations of any fraudulent behavior on the part of Defendants relating to the capacity swaps are flawed. Although Plaintiffs allege that Defendants entered into numerous "sham" capacity swaps with other carriers, Plaintiffs do not identify a single allegedly fraudulent swap. Nor do Plaintiffs allege (1) the identities of the parties to each allegedly fraudulent transaction; (2) when the allegedly fraudulent transactions occurred; (3) the terms; (4) why the transactions were fraudulent; and (5) how much revenue C & W improperly recognized pursuant to each transaction. *See, e.g.,* Complaint ¶¶ 63–71. Because of this, not only do Plaintiffs fail to plead any alleged fraudulent conduct surrounding the capacity swap transactions with particularity, but Plaintiffs also fail to plead that any of the Defendants engaged in the requisite degree of scienter. Although Plaintiffs make bold statements that Defendants knew or were reckless in not knowing of the purported fraud, there are no factual allegations in the Complaint showing that the Defendants had direct knowledge of each alleged accounting impropriety. *See* Compl. ¶ 135(f)-(h); Ind. Def. Mem. § II(A)(2)(a). Nor do Plaintiffs plead a factual basis establishing recklessness. *See Id.* § II(A)(2)(b).

### *iii. Lease Commitments*

The Court holds that Plaintiffs have not adequately plead scienter in regard to its allegations of Defendants' fraudulent conduct in regard to its alleged understatement of C & W's lease commitment, because Plaintiffs have only pled that C & W "knew" of these commitments, which by itself does not constitute scienter.

Plaintiffs allege that, because C & W disclosed total operating lease commitments in November 2002 that were greater.than the amount disclosed in C & W's September 2002 financial statements, the lease commitments in the September financials were fraudulently misstated. *See* Compl. ¶¶ 90–94. Specifically, Plaintiffs argue that C & W disclosed operating lease commitments on September 30, 2002 and updated and revised the disclosure six weeks later, on November 13, 2002, after conducting a major portfolio review. See Compl. ¶ 91. In essence, Plaintiffs have only pled that C & W "knew" of its business affairs. This does not constitute scienter. Merely pleading that a corporation "knew" of its business affairs would effectively eliminate the scienter requirement. *In re Orbital Securities Litigation,* 58 F.Supp.2d. 682, 685 (E.D.Va.1999).

Plaintiffs also fail to plead any alleged fraudulent conduct related to Defendants' lease commitments with particularity for four reasons. First, Plaintiffs fail to allege a factual basis for why they believe that the total operating lease commitments in the September 2002 SEC filing were fraudulently, as opposed to negligently, overstated. Second, Plaintiffs fail to identify the individuals involved in the purported fraud. Third, Plaintiffs fail to identify the terms of any particular lease that C & W failed to disclose or account for in its final figures. Fourth, Plaintiffs fail to plead facts showing how much the total figure was overstated.

■ Because Plaintiffs have not sufficiently pled scienter to any of the individual defendants, they cannot now argue that Defendant C & W possessed the required scienter to also be liable under the securities laws. "While it is not disputed that a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee. A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual." *First Equity Corp. of Florida v. Standard & Poor's Corp.,* 690 F.Supp. 256 (S.D.N.Y.1988); *see also Kern Oil & Refining Co. v. Tenneco Oil Co.,* 792 F.2d 1380, 1386–87 (9th Cir.1986). Because the only employees that Plaintiffs allege scienter for are Defendants Lerwill and Wallace, C & W cannot now be held to possess scienter when Plaintiffs have failed to plead scienter as to Messrs. Lerwill and Wallace.

### iv. *Generally Accepted Accounting Principles (GAAP) Violations*

■ The Court holds that Plaintiffs allegations of Defendants GAAP violations, standing alone, is insufficient to establish scienter. Courts have held that GAAP violations, standing alone, are insufficient to establish the strong inference of scienter as required by the PSLRA. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1020–21 (5th Cir.1996); *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999). As outlined above, Plaintiffs fail to establish a strong inference of scienter on any of its claims. Therefore, Plaintiffs cannot establish scienter based on alleged violations of GAAP by Defendants.

### C. *Particularity—Group Pleading Doctrine*

■ The Court also holds that Plaintiffs fail to plead their facts with particularity, as required by the PSLRA. Plaintiffs' Complaint fails to plead with particularity because they engage in what is known as the "group pleading doctrine." Many courts do not allow a party to plead under the "group pleading doctrine." Historically under this doctrine, a company's statements or omissions "may be presumed to be the collec-

tive work of those individuals with direct involvement in the everyday business of the company." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 902, n. 45 (S.D.Tex.2001).

There has been some dispute in the various circuits as to whether the group pleading doctrine survived the heightened pleading standards initiated by PSLRA. *See generally* William O. Fisher, *Don't Call Me a Securities Law Groupie: The Rise and Possible Demise of the "Group Pleading" Protocol in 10b–5 Cases,* 56 Bus. Law. 991 (2001). However, two district courts within the Fourth Circuit have held that group pleading is impermissible in securities fraud cases. The District of Maryland, *In re Medimmune, Inc. Sec. Litig.,* 873 F.Supp. 953, 960 held that Plaintiffs are forbidden from "group[ing] defendants together without specifying which defendant committed which wrong" and are required instead to "set forth with particularity each defendant's culpable conduct." In *Apple v. Prudential–Bache Sec., Inc.,* 820 F.Supp. 984, 987 (W.D.N.C.1992), the Western District of North Carolina ruled on a plaintiff's pleading that stated, "Defendants have manipulated the market … by making statements to the press … and by omitting to disclose their lack of basis for such statements and their true intent in making such statements." *Id.* at 987. This court held that such a pleading was impermissible, for it failed to adhere with the pleading requirements of Rule 9(b). *Id.* In an unpublished opinion, the Fourth Circuit, in *Juntti v. Prudential–Bache Sec., Inc.,* No. 92–2066, 1993 WL 138523 (4th Cir. May 3, 1993), wrote of group pleading that, "Such pleading practice is insufficient either to provide a defendant with fair notice of the claim against him or to protect a defendant from harm to his reputation or goodwill … the burden rests on plaintiffs to 'enable a particular defendant to determine with what it is charged.'" (quoting *Hoover v. Langston*

*Equip. Assocs., Inc.,* 958 F.2d 742, 745, (6th Cir.1992)).

In essence, the Fourth Circuit, as well as various district courts within the Fourth Circuit, have held that group pleading goes against the grain of the particularity requirement of both PLSRA and Fed. R.Civ.P. 9(b), which requires that Plaintiffs' allege the "who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Plaintiffs', by grouping defendants in their Complaint, have failed to meet this test.

The following sections and specific paragraphs of Plaintiffs' Complaint violate the group pleading rule, either in part or in whole: "Defendants' Fraudulent Scheme: To Accomplish Cable & Wireless's Transition, Defendants Misrepresented the Company's Net Cash, Revenues and Lease Commitments." (¶ 40); "Defendants' Misrepresented C & W's Cash Position" (¶¶ 42, 43, 44, 45, 46, 47, 49, 50, 51, 52, 53, 54, 58, 61, 62); "Cable & Wireless Misled Investors By Reporting Phantom Revenues from Sham Capacity Swap Transactions (¶ 63)"; "False and Misleading Statements" (¶¶ 95, 96, 97, 98, 99, 100, 101, 102, 103, 105, 106, 107, 108, 110, 113, 119, 120, 121, 123, 124, 125, 129); "The Truth is Revealed" (¶¶ 130, 131, 132); "Additional Scienter Allegations" (¶ 135); "Motive and Opportunity" (¶ 136); "First Claim for Relief" (¶¶ 138, 139, 140, 141). In all of these paragraphs, Plaintiffs' refer, presumably, to Lerwill, Robins, Wallace, and C & W itself as "defendants." In all of these paragraphs, Plaintiffs do not distinguish the "who" test that *DiLeo* describes. It is impossible, based upon the Complaint, to determine which defendant is responsible for the allegedly fraudulent acts.

Plaintiffs argue, in ¶ 28 of their Complaint, that, "It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the

false and misleading information conveyed in the Company's SEC filings and press releases as alleged herein are the collective actions of this narrowly defined group." In their Memorandum in Opposition, Plaintiffs' cite various cases which hold that the group pleading doctrine is permissible.[3] Of the cases that Plaintiffs cite, most hold that group pleading is permissible when a plaintiff refers to a "group published document" such as a website or a SEC filing. *Martino–Catt v. E.I. duPont de Nemours & Co.*, 213 F.R.D. 308, 314–15 (S.D.Iowa 2003). *In re: Sensormatic Elec. Corp. Sec. Litig.*, 2002 WL 1352427, a case from the Southern District of Florida, goes as far as to allow group pleading in corporate documents such as annual reports, quarterly and yearly financial statements and press releases. *Id.* at *4–5. However, the Fourth Circuit, as well as two district courts within the Fourth Circuit—the Western District of North Carolina and the District of Maryland—have all ruled that group pleading is impermissible. In *Apple*, the Western District of North Carolina specifically addressed group pleading as it relates to press statements, and found the practice impermissible. *Apple*, 820 F.Supp. at 987.

In addition, as explained above, regardless of Plaintiffs violations of the group pleading doctrine, Plaintiffs do not plead their claims regarding the capacity swap transactions, nor the lease commitments, with the particularity required under the PLRSA.

### D. Plaintiffs 20(a) Control Liability Claims

 The Court holds that Plaintiffs, because they fail to adequately plead a primary violation of Defendants under § 10(b) of the Securities Act, also fail to state that Defendants Lerwill and Wallace were controlling persons as to constitute control liability. In their briefs, Plaintiffs and Defendants argue as to whether a party can plead both a 10(b) claim (a primary claim), and a claim alleging that a party is a controlling person under 20(a) of the Exchange Act. These arguments are moot, as both parties agree that one must first prove a primary violation under 10(b) before one even has standing to plead a 20(a) motion. *Longman*, 197 F.3d at 686.

Section 20(a) of the Securities Act states:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class. 15 U.S.C. § 78t–1(a).

In order to state a claim under Section 20(a) a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *CINAR*, 186 F.Supp.2d at 319 (quoting *Bo-*

---

**3.** *See Martino–Catt v. E.I. duPont de Nemours & Co.*, 213 F.R.D. 308, 314–15 (S.D.Iowa 2003); *In re Sensormatic Elec. Corp. Sec. Litig.*, 2002 WL 1352427 at *4–5 (S.D.Fla. June 10, 2002); *Tricontinental Indus. Ltd. v. Anixter*, 215 F.Supp.2d 942, 946–47 (N.D.Ill.2002); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 152 (D.Mass.2001); *In re American Bank Note Holographics Sec. Litig.*, 93 F.Supp.2d 424, 442 (S.D.N.Y.2000); *Griffin v. GK Intelligent Systems, Inc.*, 87 F.Supp.2d 684, 688 (S.D.Tex.1999).

*guslavsky v. Kaplan,* 159 F.3d 715, 720 (2nd Cir.1998)). The Court has already determined that Plaintiffs fail to plead a primary violation. Even assuming, arguendo, that Plaintiffs had pled a primary violation, this Court has previously held that the question of whether someone qualifies as a control person under § 20(a) is a complex factual question and is not ordinarily subject to resolution on a motion to dismiss. *MicroStrategy,* 115 F.Supp.2d at 661; *see also In re Cabletron Sys. Inc. Sec. Litig.,* 311 F.3d 11, 32 (1st Cir.2002); *Wool v. Tandem,* 818 F.2d 1433, 1441 (9th Cir.1987); *In re Executive Telecard Ltd. Sec. Litig.,* 913 F.Supp. 280, 285–86 (S.D.N.Y.1996).

## CONCLUSION

In conclusion the Court holds that Defendants' Motion to Dismiss the Foreign Purchasers for Lack of Subject Matter Jurisdiction is denied. The Court holds that it does have subject matter jurisdiction over the claims of the foreign purchasers, the OTPP. Plaintiffs have successfully pled that a significant amount of allegedly fraudulent conduct occurred in the United States, and this alleged conduct was material to the entire fraud. This conduct was the alleged capacity swap transactions which Plaintiffs claim were negotiated and executed in Virginia.

The Court holds that Defendants C & W, Lerwill and Wallace's Motion to Dismiss for Failure to State a Claim is granted. The Court finds that Plaintiffs' Complaint fails to allege fraud with the specificity required under Federal Rule of Civil Procedure 9(b) which is applied specifically to securities fraud cases through the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b). Specifically, the Complaint fails to (1) specify each alleged misleading statement with particularity, (2) establish each allegation as a

material fact, and (3) raise a strong inference that Defendants acted intentionally, consciously, or recklessly. Because Plaintiffs have failed to prove a primary violation of the securities laws, the Court holds that their Count II against the individual defendants asserting control person liability under § 20(a) of the Act also fails to state a claim. Regardless, of whether Plaintiffs have proven a primary violation or not, however, Plaintiffs Count II claim fails because they have failed to provide adequate facts to support their allegations of control person liability against the individual defendants.

Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss the Claims of Foreign Purchasers for Lack of Subject Matter Jurisdiction is DENIED.

ORDERED that Defendant Cable and Wireless, PLC's Motion to Dismiss the Consolidated Class Action Complaint is GRANTED.

ORDERED that the Individual Defendants' Motion to Dismiss the Consolidated Class Action Complaint is GRANTED.

Leave to amend Plaintiffs' Complaint under these circumstances is futile. In this case, Plaintiffs had the opportunity to fully explore their grounds for the Complaint. Also, the Consolidated Class Action Complaint is the second Complaint filed in this case.[4] The Court will NOT grant leave to amend. A separate judgment dismissing this case under Rule 58 of the Federal Rules of Civil Procedure will follow. This case is closed.

The Clerk is directed to forward this Order to counsel of record.

---

4. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).